IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARL C. GREER and | ) | |
| THOMAS A. FLOYD, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| v. | ) | FILED: AUGUST 29, 2008 |
| | ) | 08CV4958 |
| ADVANCED EQUITIES, INC., | ) | JUDGE MANNING |
| KEITH DAUBENSPECK, | ) | MAGISTRATE JUDGE COLE |
| and DWIGHT BADGER, | ) | JURY TRIAL DEMANDED |
| | ) | EDA |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiffs, Carl C. Greer and Thomas A. Floyd, through their attorneys, complain of defendants Advanced Equities, Inc., Keith Daubenspeck, and Dwight Badger as follows:

## NATURE OF ACTION

1.      This is an action to recover damages caused by a series of misrepresentations and broken promises by defendants first to induce plaintiffs Greer and Floyd to invest money through Advanced Equities, Inc., a company then controlled by Daubenspeck, Badger, and Lee Wiskowski, who is not a defendant, and then, after defendants had inveigled money from Greer and Floyd and promised to bring Greer and Floyd into other investments through a Consulting Agreement to make good on defendants' earlier misconduct, more broken promises by their breach of the Consulting Agreement.  Greer and Floyd also seek recovery for breach of fiduciary duty, securities fraud, and common law fraud.

2.      Daubenspeck and Badger, through their employee Paul Wilkowski, approached Greer and Floyd as potential investors.  Defendants convinced Greer and Floyd to place their

trust and confidence in Daubenspeck and Badger and to use Advanced Equities as their agent and advisor for various investment opportunities.  Relying on defendants' misrepresentations, including but not limited to their misrepresentations concerning the true financial condition of a company called Pixelon, Inc., Greer and Floyd committed funds and invested over $4 million in companies recommended by defendants: nearly $2 million in Pixelon and over $2 million more in other companies recommended by Daubenspeck and Badger.

3.     For example, when convincing Greer and Floyd to invest in Pixelon, defendants knew but failed to disclose that Pixelon's senior management team was incompetent, untrustworthy, and in a state of turmoil.  Although they knew, defendants never informed Greer and Floyd that Pixelon's founder, largest stockholder, Chairman of the Board, and Chief Technology Officer, was a convicted embezzler living under an assumed identity as a fugitive from the law.  Defendants also knew or should have known, but never disclosed, that the allegedly "proprietary" technology on which Pixelon's business was based did not exist and that both Advanced Equities and Pixelon had been affirmatively misleading investors about the existence and capabilities of the technology.  When the facts about Pixelon eventually came to light, Pixelon's creditors filed suit and Pixelon sought bankruptcy protection.  Today, Greer's and Floyd's investment in Pixelon has no value.

4.     When the investments soured, defendants, knowing they had misled Greer and Floyd, sought to forestall any litigation by promising to compensate Greer and Floyd.  To this end, Daubenspeck, Badger, and Wiskowski, the former Chairman of Advanced Equities, entered into a Consulting Agreement with Greer and Floyd as partial compensation to Greer and Floyd for their lost investment and promised to transfer and convey security interests that Daubenspeck, Wiskowski, and Badger owned or planned to acquire in various companies.  As

consideration for Greer and Floyd not bringing suit immediately, defendants promised to convey to Greer and Floyd shares of Advanced Equities as a "kicker" in addition to their promise to repay Greer and Floyd for their investment, their lost opportunity costs, and their attorneys' fees. Since the Consulting Agreement was executed, however, and since its amendments reaffirming and increasing defendants' obligations under the Consulting Agreement, Daubenspeck and Badger failed to keep their promises under the Consulting Agreement, and Greer and Floyd have not recouped their investments. Defendants entered into a series of tolling agreements with Greer and Floyd to continue to forestall litigation but have not made good on their promises to Greer and Floyd in the interim. The tolling agreements have now expired and Greer and Floyd bring this action to recoup their initial investment, to recover their lost opportunity costs, to receive the benefits of the "kicker," and to recover their costs and attorneys' fees.

## JURISDICTION AND VENUE

5.     Jurisdiction is proper under 28 U.S.C. § 1331 because this case involves a federal question under the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* This Court has jurisdiction over the other claims set forth herein under 28 U.S.C. § 1367.

6.     Venue is proper in this Court under 28 U.S.C. § 1391 because defendants reside and do business in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## COMMON FACTUAL ALLEGATIONS

### The Parties

7.     Carl C. Greer ("Greer") is an Illinois resident. On October 22, 1999, he agreed with Pixelon to purchase 1,080,000 shares of Series A Preferred Stock in Pixelon stock for $1,890,000 ($1.75 per share) in reliance on misrepresentations made by defendants.

8.    Thomas A. Floyd ("Floyd") is an Illinois resident.  On October 22, 1999, he agreed with Pixelon to purchase 30,000 shares of Series A Preferred Stock in Pixelon for $52,500 ($1.75 per share) in reliance on misrepresentations made by defendants.

9.    Keith Daubenspeck ("Daubenspeck") was Advanced Equities' President and now serves as Chairman of Advanced Equities, Inc.

10.    Dwight Badger ("Badger") was an employee, agent, or representative of Advanced Equities, Inc. and, on information and belief, is now President and Chief Executive Officer of Advanced Equities, Inc.

11.    Advanced Equities, Inc. ("Advanced Equities"), is a corporation organized and existing under the laws of the State of Indiana with its principal place of business in Chicago, Illinois.

### Relevant Non-Parties

12.    Pixelon, Inc. ("Pixelon") was, at all relevant times, a California corporation with its principal place of business in San Juan Capistrano, California.  Defendants represented Pixelon to be in the business of providing streaming technology to broadcast audio and video over the internet.  Pixelon claimed to be the first full-screen, full-motion, TV-quality internet broadcaster.

13.    Paul Wilkowski ("Wilkowski") was, at all relevant times, an employee and sales representative of Advanced Equities.  Wilkowski was, and held himself out to be, an agent of Advanced Equities, Daubenspeck, and Badger with the authority to take actions on behalf of defendants relating to, among other things, the various investments Greer and Floyd made with and through defendants.

14.     Lee Wiskowski ("Wiskowski") was, at the time, the Chairman of Advanced Equities, Inc.  Wiskowski is no longer employed by Advanced Equities, Inc. and is not named as a defendant in this action.

15.     Adam Michael Fenne a/k/a David Stanley ("Stanley") was the founder, Chief Technology Officer, Chairman of the Board, and largest individual shareholder of Pixelon as of October 22, 1999.  To induce Greer and Floyd to invest in Pixelon, defendants told Greer and Floyd that Stanley developed the technology on which Pixelon's business was based and that Pixelon's "success depends in significant part upon the continued service of a relatively small number of key senior management personnel, particularly [Stanley], the Company's Founder, Chairman of the Board and Chief Technology Officer."

16.     At the time of defendants' representations to Greer and Floyd regarding their investment in Pixelon, all defendants knew or should have known, Stanley was a fugitive from Virginia authorities after being convicted of embezzling $1.25 million from members of his father's church.  Stanley was forced to resign from Pixelon for waste and mismanagement a few weeks after defendants told Greer and Floyd that Stanley was essential to Pixelon's success and Greer and Floyd invested nearly $2 million in Pixelon.  On information and belief, Stanley is incarcerated in Virginia.

### Defendants Solicit Greer and Floyd to Become Their Investment Advisor

17.     In the Fall of 1999, an Advanced Equities salesman, Wilkowski, contacted Greer and Floyd to solicit them to become customers of Advanced Equities.  Wilkowski told Greer and Floyd that Advanced Equities had superior knowledge regarding potentially lucrative investments and offered, on defendants' behalf, to consult with and advise Greer and Floyd regarding those opportunities.

18.     Greer and Floyd had several communications with Wilkowski and other employees and agents of Advanced Equities regarding a number of investment opportunities, including Pixelon.  In those communications, defendants offered advice and counsel to Greer and Floyd regarding those opportunities and made specific recommendations to Greer and Floyd about the nature and quality of the companies under consideration and the range of investment returns each represented.

19.     Daubenspeck and Badger indicated, and their agent Wilkowski expressly stated, that defendants operated through Advanced Equities, and Greer and Floyd understood that Advanced Equities was acting as Greer's and Floyd's agent for the purpose of identifying, investigating, and advising Greer and Floyd regarding investment opportunities, including Pixelon.

20.     Defendants identified, consulted, counseled, and advised Greer and Floyd regarding several investment opportunities, including Pixelon.

21.     Defendants intended and expected Greer and Floyd to rely on their advice and counsel regarding investment opportunities and to invest based on that advice and counsel.

22.     Defendants did have superior knowledge regarding the investment opportunities, including Pixelon, and Greer and Floyd placed trust and confidence in defendants when evaluating the investment opportunities.

23.     In specific reliance on defendants' advice, counsel, and representations, Greer and Floyd invested a total of $4,083,345 in several opportunities recommended by defendants, including Pixelon.

**Pixelon**

24.     Among other things, Wilkowski told Greer and Floyd that Pixelon was an up-and-coming internet company that was going to use a special technology developed by the company's founder, Stanley, to become the first provider of TV-quality internet broadcasts.

25.     Wilkowski told Greer and Floyd that Advanced Equities was significantly involved with Pixelon and was planning to have several representatives from Advanced Equities on Pixelon's board of directors.

26.     Wilkowski also told Greer and Floyd that the principals of Advanced Equities had invested in Pixelon because they viewed it as a good investment.

27.     Defendants had been working with Pixelon for several months prior to their discussions with Greer and Floyd and had access to all of Pixelon's senior level managers, books, records, contracts, and financial information.  Wilkowski told Greer and Floyd that Advanced Equities was very familiar with Pixelon and its management.

28.     Daubenspeck and Badger had the power to control the actions of Wilkowski with respect to the sale of Pixelon stock to Greer and Floyd and exercised that power.

**The Placement Memorandum**

29.     Advanced Equities prepared an Amended and Restated Private Placement Memorandum dated August 25, 1999 (the "Placement Memorandum") used to solicit investors to purchase Series A Preferred Stock in Pixelon.  In addition to participating in the preparation of the Placement Memorandum, Wilkowski, Wiskowski, Daubenspeck, and Badger reviewed and approved the use of the Placement Memorandum and the representations in the Placement Memorandum in connection with the sale of Pixelon stock to Greer and Floyd.

30.    Advanced Equities was Pixelon's "Placement Agent" for the stock offering described in the Placement Memorandum.

31.    Advanced Equities received approximately $2,400,000 from the proceeds of the offering of Pixelon Series A Preferred Stock and warrants to purchase in excess of 1,000,000 shares of Pixelon stock for acting as Pixelon's Placement Agent.

32.    In the Placement Memorandum, Advanced Equities represented, among other things, that the stock offering was intended to raise $20,650,000, which together with other funds already raised would be "sufficient to finance the Company's operations at currently anticipated levels for a period through approximately June 1, 2000." (Placement Memorandum at p. 22.)

33.    Advanced Equities represented in the Placement Memorandum and Wilkowski told Greer and Floyd that the Pixelon Network was going to be launched officially at an October 1999 live concert broadcast involving famous musical groups such as The Who, The Dixie Chicks, and Tony Bennett.  Advanced Equities represented that this event would cost no more than $7,000,000. (Placement Memorandum at p. 22.)

34.    Advanced Equities also represented that Stanley founded Pixelon and began the development of the technology used by Pixelon. (Placement Memorandum at p. 30.)  Advanced Equities told Greer and Floyd that Pixelon's success depended "in significant part upon the continued service of a relatively small number of key senior management personnel, particularly [Stanley], the Company's Founder, Chairman of the Board and Chief Technology Officer." (Placement Memorandum at p. 14.)

## October 22, 1999: Greer and Floyd Agree to Buy Stock

35.    Defendants recommended that Greer and Floyd invest in Pixelon.

36.    Defendants intended for Greer and Floyd to rely on their advice, representations, and recommendations regarding Pixelon, and Greer and Floyd in fact relied on that advice and the representations and recommendations.

37.    On October 22, 1999, based on defendants' advice and the recommendations and the earlier representations they had made regarding Pixelon's management and financial condition, Greer agreed to purchase 1,080,000 shares of Series A Preferred Stock in Pixelon for $1,890,000 and Floyd agreed to purchase 30,000 shares of Series A Preferred Stock for $52,500.

38.    That same day, Greer and Floyd paid $1,942,500 for 1,110,000 shares of Pixelon stock under their subscription agreement.

### Defendants Meet With Greer and Ask for a Loan for Pixelon, But Fail to Disclose Pixelon's True Financial Condition

39.    In November 1999, less than two weeks after Greer and Floyd invested nearly $2,000,000 in Pixelon, Wilkowski told Greer that Pixelon needed more money.

40.    As detailed below, defendants asked Greer to lend Pixelon $1,000,000 in addition to his equity investment.

41.    Greer met with Wiskowski, Badger, and Wilkowski of Advanced Equities to discuss the request for a loan to Pixelon.  Wiskowski told Greer that Pixelon needed the money because Pixelon liked to pay its bills in advance to obtain certain financial incentives.

42.    Neither Badger, Wilkowski, Wiskowski, nor any other Advanced Equities representative told Greer that Pixelon needed the money because Pixelon was having financial difficulties, needed additional operating capital, or was overspending.

43.    Greer refused to lend Pixelon money.

44.    Later in November 1999, Wilkowski told Floyd that Stanley had been engaging in mismanagement and that his contract was going to be terminated.  Floyd asked whether this

would be a problem for Pixelon in light of Advanced Equities' and Pixelon's prior representations regarding Stanley's importance to the company. Wilkowski said it would not be a problem because Stanley was not really necessary to run the company.

45.    Neither Wilkowski nor anyone else from Advanced Equities told Greer or Floyd that Stanley was a convicted embezzler and a fugitive from the law.

<b>Seven Weeks After Greer and Floyd Invest,<br><u>Advanced Equities Discloses Pixelon's Need for an Additional $21,500,000</u></b>

46.    On December 9, 1999, Advanced Equities issued a "Supplement" to the Placement Memorandum.

47.    The Supplement was issued in conjunction with an effort by Advanced Equities to sell additional shares of Series A Preferred Stock to raise additional funds to support Pixelon's operations. (Supplement at p. 2.)

48.    The original offering, in which Greer and Floyd had participated, raised $18,172,000 in capital for Pixelon. Advanced Equities told Greer and Floyd that this was all that was required to fund Pixelon's operations through June 1, 2000. (Placement Memorandum at p. 22.)

49.    In the Supplement, issued less than seven weeks after Greer and Floyd invested, Advanced Equities admitted that Pixelon actually needed an additional $21,500,000 to fund operations through June 1, 2000, or more than double the amount originally represented in the Placement Memorandum. (Supplement at p. 2.)

50.    Defendants knew when they induced Greer and Floyd to invest in Pixelon that Pixelon would require substantially more than $18,172,000 to fund its operations through June 1, 2000, but they failed to disclose this material information to Greer and Floyd.

51.     In addition, defendants disclosed for the first time that Pixelon's capitalization had changed substantially since the Placement Memorandum.  Specifically, in the Supplement Advanced Equities disclosed that Pixelon had "issued a substantial number of additional shares to third parties and employees, and in addition had issued a substantial number of additional warrants and options to such persons under which they have the right to purchase shares of the Company's Common Stock at various exercise prices."   (Supplement at p. 2.)   In the Supplement, Advanced Equities also disclosed for the first time that the performers at the launch event and their managers were given warrants or grants for in excess of 700,000 shares of Pixelon stock, diluting the investment sold to Greer and Floyd.

52.     Defendants also knew by the time they induced Greer and Floyd to invest in Pixelon that there had been substantial changes in Pixelon's capitalization, but failed to disclose this material fact to Greer and Floyd.

### Excessive Costs of Launch Event

53.     Advanced Equities disclosed in the Supplement that the launch concert "greatly exceeded the expected costs."  According to Advanced Equities, the launch held on October 29, 1999, one week after Greer and Floyd had invested in Pixelon on the basis of the Placement Memorandum and the representations made by the defendants, "will cost in excess of $15 million, although the precise costs have not been determined at this time."  (Supplement at p. 1.)

54.     Defendants also disclosed to Greer and Floyd for the first time that the contracts with performing artists alone exceeded the entire $7 million dollars allotted in the Placement Memorandum for use on marketing and public relations on or before June 1, 2000.

55.     Defendants also disclosed to Greer and Floyd for the first time that Pixelon had contracts with various entities to pay in excess of $4 million for services related to the October

29, 1999 launch (Supplement at pp. 6–7), although none of these contracts were listed in the "Material Contracts" section of the Placement Memorandum (Placement Memorandum at pp. 27–29).

56.     Defendants knew by the time they induced Greer and Floyd to invest in Pixelon that Pixelon had contracts that required Pixelon to pay in excess of $11 million for the launch event one week later, but defendants failed to disclose that material fact to Greer and Floyd.

57.     On October 22, 1999, defendants knew that the representation in the Placement Memorandum that Pixelon would need only $7 million for marketing and public relations through June 1, 2000 was false, but they failed to disclose that material fact to Greer and Floyd.

### Undisclosed Material Contracts

58.     In the Supplement, Advanced Equities disclosed no less than nine "Material Contracts" (in addition to those contracts related to the launch event discussed above) that had not been previously disclosed.  (Supplement at pp. 4–7.)  No less than five, and possibly all, of these "Material Contracts" had been entered into prior to October 22, 1999, although defendants did not disclose their existence to Greer and Floyd.

59.     Advanced Equities also disclosed for the first time in the Supplement that Pixelon had terminated its contract with its attorneys prior to October 22, 1999 and was embroiled in contract disputes with no less than five companies, including Reuters Newmedia, Inc. and Warner Brothers, based on contracts that were not disclosed to Greer and Floyd prior to October 22, 1999.  (Supplement at pp. 3–5.)  Defendants knew about these issues when they induced Greer and Floyd to invest in Pixelon, but failed to disclose these material facts.

<u>**Termination of Stanley's Employment**</u>

60.     In the Supplement, Advanced Equities disclosed that Stanley and Pixelon had "mutually agreed to end [Stanley's] relationship with the Company and position as Chairman of the Company's Board of Directors."  (Supplement at p. 8.)

61.     Advanced Equities also disclosed that, without authority to do so, Stanley had entered into agreements with Warner Brothers and MP3.com, Inc. that could cost Pixelon in excess of $5 million.

62.     Advanced Equities also first disclosed in the Supplement that Stanley had a warrant to purchase 3,000,000 shares of common stock and an option to purchase an additional 4,100,000 shares for an undisclosed sum, further diluting Greer's and Floyd's potential investments.  (Supplement at p. 8).  In contrast, the Placement Memorandum disclosed only that Stanley owned 3,000,000 shares and did not disclose Stanley's right to purchase an additional 7,100,000 shares, which would have given him a significantly larger percentage ownership in the company. (Placement Memorandum at p. 37).

63.     Defendants knew when they induced Greer and Floyd to invest that Stanley had been engaging in waste and mismanagement and that Stanley had received options to purchase a substantial number of additional shares in Pixelon, but they did not disclose these material facts to Greer and Floyd.

64.     Defendants also did not disclose that Stanley had been convicted of embezzling $1.25 million from his father's church or that he was living under an assumed identity as a fugitive from the law.

65.     Defendants knew or should have known when they induced Greer and Floyd to invest in Pixelon that Stanley was a convicted felon living under an assumed name, but failed to disclose this material fact to Greer and Floyd.

### Litigation, Employment Disputes, and Resignations

66.     Advanced Equities also disclosed for the first time in the Supplement that material litigation had been filed against Pixelon prior to October 22, 1999, along with various employment disputes and resignations involving significant managerial positions, such as the Chief Operating Officer, Chief Executive Officer, and Chief Financial Officer.  (Supplement at pp. 9–11.)  For example, Advanced Equities disclosed that Pixelon's Chief Financial Officer "tendered his resignation in writing due to concerns about the Company's ability to operate within budget and other issues."  (Supplement at p. 10.)

67.     Defendants knew when they induced Greer and Floyd to invest in Pixelon that Pixelon was engaged in litigation and was embroiled in employment disputes with many members of its senior management team, but did not disclose these material facts to Greer and Floyd.

### Undisclosed Bridge Financing

68.     Advanced Equities also disclosed in December 1999 that Pixelon had been forced to borrow $3.55 million dollars from investors through bridge notes in October and November 1999 to fund company operations.  (Supplement at pp. 11–12.)

69.     Pixelon borrowed $1,000,000 on October 19, 1999, just three days before Greer and Floyd agreed to purchase stock.

70.     Pixelon borrowed an additional $500,000 on October 21, 1999, the day before Greer and Floyd agreed to purchase stock.

71.     Defendants knew of these loans prior to October 22, 1999 but did not disclose them to Greer and Floyd until the December 1999 Supplement.

72.     On October 26, 1999, four days after Greer and Floyd agreed to purchase stock, Pixelon borrowed another $1,000,000.

73.     On November 23, 1999, Pixelon borrowed an additional $1,050,000.

74.     On October 22, 1999, defendants knew that Pixelon needed and was planning to obtain additional bridge financing, including the October 26, 1999 and November 23, 1999 loans, because of its perilous financial condition, but did not disclose this fact to Greer and Floyd

75.     On October 22, 1999, defendants knew that Pixelon and its senior management were overspending and otherwise mismanaging Pixelon's finances and business as described herein, but did not disclose this fact to Greer and Floyd.

76.     On October 22, 1999, defendants knew that Pixelon was in serious financial trouble, but did not disclose that fact to Greer and Floyd.

<b>Pixelon Admits to Lying About<br>the Existence and Capabilities of Its Technology</b>

77.     Defendants told Greer and Floyd that the success of Pixelon's business depended on supposedly proprietary and highly advanced streaming technology that allowed Pixelon to broadcast live television quality images.

78.     In May 2000, Pixelon admitted that its claims regarding its technology were not true.  Pixelon admitted that it had affirmatively misled investors and the public regarding the nature and the capabilities of its technology.

79.     Pixelon admitted its technology was not unique or proprietary technology as it and Advanced Equities had claimed, but actually was an adaptation of a common Windows Media Player computer program.

80.    Pixelon employees admitted they knew long before October 22, 1999 that Pixelon's technology was not proprietary or capable of meeting its claimed capabilities and that they reported this information to Pixelon's senior management no later than August 1999.

81.    Defendants knew or should have known that the representations they made to Greer and Floyd regarding the technology on which Pixelon was based were false.

### Greer and Floyd Meet With
### Defendants and Demand Rescission

82.    In December 1999, after receiving the Supplement, Greer and Floyd met with Wiskowski, Daubenspeck, Badger, and Wilkowski, all of Advanced Equities.

83.    Greer and Floyd told defendants, Wiskowski, and Wilkowski that they were concerned about the condition of Pixelon as disclosed in the Supplement and wanted their money back.

84.    Defendants did not want to give Greer and Floyd their money back, in part because they claimed not to have the liquid assets at the time to be able to do so.  They promised to continue to try to find ways to make Greer and Floyd whole and, as an alternative to immediate litigation, the parties continued these discussion for several months.

### Defendants Propose an Opportunity for
### Greer and Floyd to Recoup Their Investments

85.    In September 2000, defendants finally proposed an arrangement that they said would give Greer and Floyd the opportunity to recoup their investments, their expenses, and their opportunity costs, as well as interest, while, at the same time, provide a real benefit to Daubenspeck, Wiskowski, and Badger, as well as to Advanced Equities.  To induce Greer and Floyd not to file suit immediately, defendants proposed to convey additional securities to Greer and Floyd as consideration for their forbearance.

86.     Specifically, Daubenspeck, Wiskowski, and Badger suggested that they enter into a Consulting Agreement with Greer and Floyd.  They suggested that the proposed Consulting Agreement would provide benefits to them individually as well as to Advanced Equities, but would serve principally as a vehicle: (a) to repay Greer and Floyd for their investment in Pixelon, (b) to repay Greer and Floyd their legal fees and costs, (c) to pay Greer and Floyd interest on both the investment and their expenses, and (d) to compensate Greer and Floyd for agreeing to defer legal action against Advanced Equities and them.  Pursuant to the arrangement reflected in part in the Consulting Agreement, Daubenspeck, Wiskowski, and Badger (collectively, the "Founders"), would pay Greer and Floyd for consulting services by transferring to Greer and Floyd or to CGTF, a general partnership wholly owned by Greer and Floyd, various equity interests and rights to equity interests then owned or to be acquired by defendants.

87.     Among other things, defendants promoted the consulting arrangement as the best means for Greer and Floyd to recoup their investment in Pixelon plus legal fees and interest on those amounts, while at the same time providing adequate consideration for deferring an immediate lawsuit against Advanced Equities and the Founders. The payment for deferring the lawsuit, and allowing the Founders to continue developing the business of Advanced Equities, came to be referred to by the parties as a "kicker." Through meetings and numerous discussions between Greer and Floyd and defendants, the parties identified various securities, equity interests, and percentages of those securities and equity interests to be considered as the "kicker." The discussions centered around companies identified at the time as WD Holdings; Information Technology Partners, GP, LLC ("ITP"); Communications Infrastructure Development Corporation ("CIDC"); and Technology Consulting Group ("TCG").  Initial discussions anticipated that a percentage of the equities and equity interests to be transferred pursuant to the

17

Consulting Agreement would provide Greer and Floyd with a recovery on their Pixelon investment plus expenses and interest, and the remainder of the equities and equity interests to be transferred would be retained by Greer and Floyd as the kicker. The parties agreed on the concepts of (a) a consulting agreement, (b) the transfer of various equity interests in an attempt to make Greer and Floyd whole, and (c) the kicker as consideration for forbearing litigation at that time.  The parties continued to discuss the timing of the loss recoupment by Greer and Floyd as well as the value of the equity and equity rights to be transferred by defendants to them.

88.    All of the securities that defendants offered to convey through the consulting arrangement, including WD Holdings, were essentially startup companies.  Skeptical of defendants' valuation of these securities and equity interests, Greer and Floyd were rightfully concerned that the securities might never mature in value.  Greer and Floyd therefore insisted, and defendants ultimately agreed, on a periodic assessment of the values of the transferred securities so that, if sufficient value was not being derived from the maturing securities, additional securities would be transferred, including increased kickers to compensate Greer and Floyd for additional forbearance from litigation.

89.    Eventually an approximate 4.9% interest in WD Holdings (now known as Advanced Equities Financial Corporation) was transferred to Greer and Floyd as the initial kicker in consideration of their forbearance from bringing suit. Additional transfers of WD Holdings were contemplated as consideration for further forbearance in the event additional time was required to make Greer and Floyd whole but, in order to assure that Greer and Floyd, or CGTF, would not be classified as a broker/dealer, cumulative transfers of WD Holdings were planned to be capped at 9.99% in total.

90.     The Founders also agreed that Greer and Floyd would have the opportunity to acquire interests in new ventures created by the Founders for a specified period.

91.     In return, in addition to their forbearance, Greer and Floyd would consult and advise Daubenspeck, Wiskowski, and Badger, and through them Advanced Equities, on investment and business matters  presented by defendants to Greer and Floyd.

92.     On September 18, 2000, Daubenspeck, Badger, and Wiskowski entered into the Consulting Agreement reflecting the understandings described above.  A true and accurate copy of the Consulting Agreement is attached hereto as Exhibit A. On October 17, 2001, in recognition of the fact that the various equity interests previously identified under the September 18 Agreement had not compensated Greer and Floyd for their losses and expenses and interest, as Greer and Floyd had feared, the Founders agreed to extend the term of the Consulting Agreement and provide additional compensation from the Founders by executing Amendment No. 1 to the Consulting Agreement.  A true and accurate copy of Amendment No. 1 to the Consulting Agreement is attached hereto as Exhibit B.

93.     Daubenspeck and Badger agreed to transfer and convey to CGTF various warrants and a 20% interest in ITP upon the execution of Amendment No. 1 on October 17, 2001.

94.     To date, CGTF has not received any interest in ITP from Daubenspeck or Badger.

95.     On March 31, 2002, because the Pixelon investment loss plus expenses and interest still had not been repaid by the prior equity transfers, excluding the kicker, the Founders agreed to amend the Consulting Agreement again and to provide for additional consideration to Greer and Floyd.  Wiskowski was not a party to this second amendment to the Consulting Agreement.  A true and accurate copy of Amendment No. 2 to the Consulting Agreement is

attached hereto as Exhibit C.  Although additional security interests and rights were committed by the defendants in Amendment No. 2, the kicker should have been but was not increased as had been agreed by the Founders in the negotiations.

96.    Under the amended Section 2.1 of the Consulting Agreement, Founders Daubenspeck and Badger agreed to transfer and convey specific securities to CGTF.  *See* Exhibit C, Exhibit I.

97.    By Amendment No. 2, Daubenspeck and Badger promised Greer and Floyd, *inter alia*, a 15% interest in all equity grants, warrants, options, and other derivative securities received by the "Companies," as defined in Amendment No. 2 (hereinafter, the "Companies"), and allocated to Daubenspeck and Badger on or before March 31, 2002, including, but not limited to warrants to purchase 151,585 shares of Arbinet-thexchange, Inc. ("Arbinet")  *See* Exhibit C, Item 1 of Exhibit I.

98.    Upon information and belief, Arbinet became a publicly-traded company in December 2004.

99.    Upon information and belief, Daubenspeck and Badger exercised their warrants to purchase shares of Arbinet at or prior to it becoming a public company.

100.    Neither Founder transferred his 15% interest in the Arbinet warrants as promised to Greer and Floyd prior to Arbinet becoming a public company.

101.    Floyd, on his own behalf and also on behalf of Greer, asked Daubenspeck and Badger to transfer their interests in the warrants to Greer and Floyd as provided in the amended Consulting Agreement to enable Greer and Floyd to exercise their interests.

102.    Greer was to receive 45,000 warrants to acquire shares of Arbinet as consideration for advancing funds to purchase Arbinet, which also allowed Advanced Equities to

hit a fund raising target and receive warrants.  After requesting a transfer of the 45,000 warrants into Greer's name so that he could control and exercise them, the Founders would not transfer the warrants, stating that Arbinet would not break up the Advanced Equities warrant as it would increase the number of shareholders, which was detrimental to Arbinet.

103.    Sometime after Arbinet became a public company, Advanced Equities performed a net exercise of its warrant and transferred the resulting shares to Greer.  On information and belief, Arbinet would have honored an allocation of warrants to Greer prior to becoming a public company.  Greer wanted to and could have tendered those shares during Arbinet's public offering.

104.    On information and belief, Daubenspeck and Badger could have transferred to Greer and Floyd the Arbinet warrants prior to Arbinet becoming a public company.  Had they done so as required by the amended Consulting Agreement, Greer and Floyd would have exercised their warrants and sold their shares when Arbinet became a public company.

105.    Pursuant to the amended Section 2.1 of the Consulting Agreement, Daubenspeck and Badger reaffirmed their commitment to transfer and convey to Greer and Floyd a 20% interest in ITP.

106.    To date, Greer and Floyd have not received the promised 20% interest in ITP.

107.    Through Amendment No. 1 to the Consulting Agreement Daubenspeck and Badger agreed to give Greer and Floyd a 10% interest in all securities received by the Companies and distributed to Daubenspeck and Badger, in their capacity as salespeople, and a 15% interest in all other securities allocated to them by the Companies before April 1, 2002.

108.    Through Amendment No. 2 to the Consulting Agreement, Daubenspeck and Badger also promised to transfer to Greer and Floyd, before allocation to any other person, a 3%

21

interest "in all of the equity grants, warrants, options or other derivative securities" received by the Companies on or after March 31, 2002 that arose out of any transactions initiated during the term of the Consulting Agreement.

109.    Finally, through Amendment No. 2, Founders Daubenspeck and Badger reaffirmed their commitment to transfer the 10% or 15% interests, and further agreed to give Greer and Floyd a 15% interest in all securities received by the Companies and distributed to Daubenspeck and Badger, in their capacity as salespeople, and a 20% interest in all other securities allocated to them by the Companies after March 31, 2002, including, but not limited to, warrants in other designated companies as outlined in Exhibit I to Amendment No. 2.

110.    With the exception of the fixed date for transfer of the 20% interest in ITP, amended Section 2.1 of the Consulting Agreement provides that the designated securities "shall be transferred effective as of the date they are received by the Founders and such Securities shall be deemed fully earned by Greer and Floyd upon the effective date of such transfer." *See* Exhibit C, Item 3.

111.    As an added assurance that Greer and Floyd would remain informed of all securities received by the Companies throughout the year so that they could determine the percentages, shares and amounts due them, the Founders amended the Books and Records clause, Section 3.12 of the Consulting Agreement, to require that Daubenspeck and Badger provide to Greer and Floyd on the first day of each calendar quarter (1) "a list of all securities received by the Companies during the prior calendar quarter" and (2) a list of any pending transactions from which the Founders contemplated that securities might be issued to the Companies and for which certain offering documents were available. *See* Exhibit C, Item 4. Greer and Floyd have never received a list of securities received by the Companies during any

calendar quarter. Nor have Greer and Floyd received a list of transactions from which it is contemplated that securities might be issued.

112. As a result of Founders' failure to provide the information required by the amended Consulting Agreement despite innumerable requests for the information, Greer and Floyd have been unable to assess the extent to which Daubenspeck and Badger have failed to transfer the percentage of interest promised in the Compensation Clause, Section 2.1.

113. Upon information and belief, however, the Companies received equity grants, warrants, options and/or other derivative securities since March 31, 2002, to which Greer and Floyd are entitled to 3% interests.

114. Greer and Floyd never received such interests.

115. On information and belief, Advanced Equities received 556,729 warrants to acquire shares of Alien Technology Corporation ("Alien Technology"). A portion of these warrants should have been allocated to Greer and Floyd, pursuant to the Consulting Agreement.

116. Advanced Equities allocated 40,000 warrants for shares of Alien Technology to Greer and Floyd. Floyd questioned Daubenspeck and Badger on a number of occasions, asking for supporting data to verify the 40,000 allocated shares. After numerous promises that the information calculating the 40,000 allocation existed and the calculation was correct, Badger finally admitted that the information did not exist. Badger said the allocation "couldn't be calculated," and the 40,000 figure was really just an amount he felt was reasonable.

117. Floyd insisted that the amount was calculable pursuant to the formula in Exhibit I of the Consulting Agreement. Floyd presented the calculation which indicated, based on information provided by Advanced Equities, that the Alien Technology warrants to which Greer and Floyd were entitled amounted to at least 66,309, and could be as high 82,845.

118.    The warrants were never provided to Greer and Floyd.

119.    Upon information and belief, the Companies have allocated to Daubenspeck and Badger, both in their capacity as salespersons and as individuals, equity grants, warrants, options, and/or other derivative securities received by the Companies, to which Greer and Floyd are entitled to a 10% and 15% interests, respectively, for those received prior to April 1, 2002, and a 15% and 20% interests, respectively, for those received after March 31, 2002.

120.    Greer and Floyd have never received such interests.

121.    Greer and Floyd have done all things required of them by the Consulting Agreement.

122.    The Consulting Agreement expired by its terms on January 31, 2006.

123.    Although the parties executed a tolling agreement and several extensions of their tolling agreement addressing aspects of their dispute, all extensions of the tolling agreement have expired.

124.    Despite due demand for completion and their performance under the Consulting Agreement, Daubenspeck and Badger have again failed to produce the income stream promised to Greer and Floyd and have not performed their other obligations under the Consulting Agreement.

## COUNT I
## BREACH OF THE CONSULTING AGREEMENT

125.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1–124 of this Complaint as though set forth fully within this Count.

126.    Section 2.1 of the Consulting Agreement, as amended on October 17, 2001 and March 31, 2002, provides that Daubenspeck and Badger will compensate Greer and Floyd for consulting services provided under the terms of the Consulting Agreement through the transfer

and conveyance of specific percentages of interests in equity grants, warrants, options, and/or other derivative securities.

127.    Section 3.12 of the Consulting Agreement, as amended on March 31, 2002, provides that Daubenspeck and Badger shall provide Greer and Floyd with lists of securities received by the Companies, together with lists of all pending transactions from which they expect securities may be issued to the Companies.

128.    Greer and Floyd fully rendered the consulting services requested of them in full compliance with the Consulting Agreement.

129.    Daubenspeck and Badger failed to compensate Greer and Floyd as required by Section 2.1 of the Consulting Agreement and its respective Amendments.

130.    Daubenspeck and Badger also refused to provide Greer and Floyd with the appropriate books and records disclosing lists of securities received and pending transactions as required by Section 3.12 of the Consulting Agreement, as amended on March 31, 2002.

131.    Daubenspeck and Badger had a duty of good faith and fair dealing in their performance of their obligations under the Consulting Agreement, both individually and through their control of Advanced Equities, but have breached the Consulting Agreement and its respective Amendments by failing to transfer and convey the promised compensation and failing to disclose the material books and records required under the Consulting Agreement.

132.    Greer and Floyd made demands upon defendants to perform under the Consulting Agreement, but despite these demands, defendants failed and refused to disclose the material books and records or to transfer and convey the promised compensation under the Consulting Agreement.

133.    Greer and Floyd have been damaged by Daubenspeck's and Badger's breaches of the Consulting Agreement and its respective Amendments.

WHEREFORE, Greer and Floyd ask this Court to enter judgment in their favor and against Daubenspeck and Badger and to award Greer and Floyd such amounts, property, and rights as may be due them under the Consulting Agreement, which amounts exceed $150,000, plus interest, costs, and their reasonable attorney's fees, additional shares of Advanced Equities Financial Corporation to represent a 9.99% interest in Advanced Equities Financial Corporation as of March 31, 2002, and such other and further relief as the Court may deem appropriate.

## COUNT II
## BREACH OF FIDUCIARY DUTY

134.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 125–33 of this Complaint as though set forth fully within this Count.

135.    Defendants told Greer and Floyd that they possessed superior knowledge and information regarding Pixelon.

136.    Advanced Equities acted as a liaison between Greer and Floyd, on the one hand, and Pixelon, on the other, and as a gatekeeper of information regarding Pixelon.  Through Advanced Equities, defendants controlled the flow of information to Greer and Floyd regarding Pixelon.

137.    Defendants encouraged Greer and Floyd to repose trust and confidence in Advanced Equities and to rely on it for investment advice regarding Pixelon.

138.    Greer and Floyd reposed trust and confidence in Advanced Equities as their agent and advisor regarding the purchase of Pixelon stock.

139.    Defendants recommended to Greer and Floyd that they invest in Pixelon, and Greer and Floyd relied on defendants' representations and recommendation to invest nearly $2 million in Pixelon.

140.    Defendants all owed a fiduciary duty to Greer and Floyd to fully and honestly disclose all material information regarding Pixelon.

141.    Defendants also owed a fiduciary duty to Greer and Floyd to diligently investigate Pixelon and the truth of the representations Advanced Equities was making regarding Pixelon.

142.    Defendants breached their fiduciary duties to Greer and Floyd by knowingly making misrepresentations of material fact and failing to disclose material facts regarding Pixelon to Greer and Floyd.

143.    Greer and Floyd have been damaged by defendants' breaches of fiduciary duty.

WHEREFORE, Greer and Floyd ask this Court to enter judgment in their favor and against Advanced Equities, Daubenspeck, and Badger and to award Greer and Floyd the consideration they paid for the Pixelon stock and compensatory and punitive damages, plus interest, costs and fees.

## COUNT III
## FEDERAL SECURITIES FRAUD

144.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 134–43 of this Complaint as though set forth fully within this Count.

145.    The Pixelon Series A Preferred Stock Greer and Floyd purchased are "securities" subject to the provisions of the Securities Act of 1933, 15 U.S.C. § 77a *et seq*.

146.    Defendants violated Sections 12(a)(2) and 17(a) of the Securities Act of 1933 by using instruments of interstate commerce to make knowingly false statements of material fact

and omissions of material fact in connection with the sale of the Pixelon Series A Preferred Stock to Greer and Floyd.

147.    Greer and Floyd did not know the statements of material fact Advanced Equities made in connection with the sale of the Pixelon Series A Preferred Stock were false.

148.    Greer and Floyd did not know of the material facts omitted by Advanced Equities, Daubenspeck, and Badger relating to the sale of the Pixelon Series A Preferred Stock.

149.    Greer and Floyd justifiably relied on Advanced Equities' misrepresentations when they decided to purchase the Pixelon stock.

150.    If Advanced Equities, Daubenspeck, and Badger had fully and accurately disclosed all material facts, Greer and Floyd would not have purchased stock in Pixelon.

151.    The material facts Advanced Equities misrepresented or Advanced Equities, Daubenspeck, and Badger omitted drastically reduced the value of Greer's and Floyd's investment.

WHEREFORE, Greer and Floyd ask this Court to enter judgment in their favor and against Advanced Equities, Daubenspeck, and Badger and to award Greer and Floyd the consideration they paid for the Pixelon stock and compensatory and punitive damages, plus interest, costs and fees.

**COUNT IV**
**COMMON LAW FRAUD**

152.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 144–51 of this Complaint as though set forth fully within this Count.

153.    Advanced Equities knowingly made false statements of material fact to Greer and Floyd to induce Greer and Floyd to invest nearly $2 million dollars in Pixelon.

154.    Greer and Floyd justifiably relied on Advanced Equities' misrepresentations when they purchased the Pixelon stock.

155.    Advanced Equities, Daubenspeck, and Badger had a duty to inform Greer and Floyd of all material facts relating to Pixelon and Greer's and Floyd's purchase of Pixelon stock.

156.    Advanced Equities, Daubenspeck, and Badger knowingly failed to disclose material facts to Greer and Floyd to induce Greer and Floyd to invest nearly $2 million dollars in Pixelon.

157.    If Advanced Equities, Daubenspeck, and Badger had fully and accurately disclosed all material facts, Greer and Floyd would not have purchased stock in Pixelon.

158.    Greer and Floyd have been damaged as a result of their reliance on Advanced Equities' misrepresentations and Advanced Equities', Daubenspeck's, and Badger's omissions because their investment in Pixelon has lost all value.

WHEREFORE, Greer and Floyd ask this Court to enter judgment in their favor and against Advanced Equities, Daubenspeck, and Badger and to award Greer and Floyd the consideration they paid for the Pixelon stock and compensatory and punitive damages, plus interest, costs, and fees.

**CARL C. GREER AND THOMAS A. FLOYD**

By:    /s/ Michael Dockterman
                        One of their attorneys

Michael Dockterman (#3121675)
(dockterman@wildman.com)
Robert L. Wagner (#6276109)
(wagner@wildman.com)
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive – Suite 2800
Chicago, Illinois  60606-1229
(312) 201-2000 (telephone)
(312) 201-2555 (facsimile)

08CV4958
JUDGE MANNING
MAGISTRATE JUDGE COLE
EDA

# Exhibit A

## CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (the "**Agreement**") is made as of this 18th day of September 2000, by and among Keith Daubenspeck, Dwight Badger, and Lee Wiskowksi (each a "**Founder**" and collectively the "**Founders**") and Carl C. Greer and Tom Floyd (the "**Consultants**").

## RECITALS:

A.   The Founders own equity interests in various businesses that provide venture capital financing, securities brokerage and investment banking services, financial, consulting and advisory services and invest in and/or operate, companies in the telecommunications services, equipment, infrastructure, wireless and other segments of the internet industry (the "**Businesses**");

B.   The Consultants are experienced and knowledgeable in matters of finance and business structure and organization;

C.   The Founders desire to retain the Consultants and the Consultants desire to be retained by the Founders to provide consulting services related to the Businesses (the "**Services**") subject to the terms, conditions and covenants hereinafter set forth;

D.   The Founders are in a position to benefit from the Services provided by the Consultants and have agreed to transfer a portion of their stock in the Companies in consideration of the Consultants agreeing to enter into this Agreement;

E.   The Founders own equity interests in the following entities engaged in the Businesses: WD Holdings Corp. ("**WDH**"), Innovative Technology Partners, G.P., L.L.C. ("**ITP**") and Communications Infrastructure Development Corporation ("**CIDC**" and collectively with WDH and ITP, the "**Companies**").

**NOW, THEREFORE,** in consideration of the foregoing and the agreements, covenants and conditions set forth herein, the Consultants and the Founders hereby agree as follows:

## ARTICLE I

## CONSULTING SERVICES

1.1   <u>Position; Term; Responsibilities</u>.  The Founders hereby engage the Consultants to perform the consulting services described herein and the Consultants hereby agree to render such services, upon the terms and conditions set forth herein.  The term of this Agreement shall be three (3) years, commencing on the date hereof (the "**Consulting Period**") <u>provided</u>, <u>however</u>, the Founders shall have the right to terminate this Agreement effective immediately upon written notice for "**Just Cause**" (as hereinafter defined).  For purposes of this Agreement "**Just Cause**" shall mean any of the following:

(a)       Either of the Consultants knowingly participates or engages in any act or fraud, embezzlement, or theft against the Founders, the Companies, or any of their Affiliates (regardless of whether such act results in a criminal conviction);

(b)       Either of the Consultants intentionally inflicts material damage to the property of the Companies or acts in any material manner that the Consultants know ( or reasonably should have known) to be in conflict with the best interests of any of the Companies;

(c)       Either of the Consultants is convicted by a court of proper jurisdiction of any crime involving an act of dishonesty or breach of trust or of a felony (other than a traffic violation);

Any termination by reason of the foregoing shall not limit or preclude any other right or remedy that the Founders may have under this Agreement or otherwise. In the event of termination of this Agreement by the Founders pursuant to this section, the Consultants shall not be entitled to any further compensation or benefits under this Agreement for periods thereafter, except as otherwise provided in this Agreement.

1.2    Death or Disability.    Notwithstanding anything in Section 1.1 to the contrary, in the event of the death or permanent disability (as hereinafter defined) of both Consultants occurring during the Term of this Agreement, this Agreement shall be deemed terminated as of such date. Consultants shall be deemed to have incurred a **"permanent disability"** after one hundred and twenty (120) days in the aggregate or after ninety (90) consecutive days, in either case, occurring in any consecutive twelve (12) month period, during which ninety (90) or one hundred and twenty (120) days, as the case may be, either Consultant, by reason of such physical or mental disability or illness, shall be unable to discharge fully his duties under this Agreement.

1.3    Performance of Consulting Services.

(a)           During the Consulting Period, the Consultants shall perform and faithfully provide the Services upon the terms and conditions set forth in this Agreement. The Consultants agree to provide up to an aggregate of fifteen (15) hours of service per calendar quarter between them, the timing of which shall be mutually agreed by the Consultants and the Founders. The Consultants agree to faithfully and diligently perform the Services, provided, however, the Consultants may engage in any activity that does not interfere or conflict with the performance of the duties hereunder and does not materially effect Consultants' ability to provide the Services.

(b)           In their role as consultants to the Company and consistent with the time commitments referenced in Section 1.3 (a), the Consultants shall provide such managerial, and developmental, financial advisory assistance as the Founders may, from time to time, require in connection with the

Business, within the Consultants' field of expertise, as may be specified from time to time to the Consultants by the Founders. The Consultants shall perform the Services in a competent manner with a reasonable level of skill and care customary under the circumstances.

1.4    Consultants' Relationship to the Company.  The Consultants shall at all times be independent contractors and are not the agents, employees or representatives of the Founders or the Companies, and no action or omission to act by the Consultants shall in any way obligate or be binding upon the Founders or the Companies.

1.5    Termination for Good Reason.  The Consultants shall have the right to terminate this Agreement prior to the expiration of the Consulting Period for Good Reason.  For purposes of this Agreement, **"Good Reason"** shall mean (a) the assignment to the Consultants of duties and responsibilities that are materially below the level of analytical, managerial, strategic or financial expertise that the Consultants have historically exhibited in their professional careers, that are not withdrawn by the Founders after a demand by the Consultants to withdraw any such assignment; or (b) continued failure by the Founders to substantially perform their material obligations hereunder after a demand for substantial performance is delivered by the Consultants to the Founders that specifically identifies the manner in which the Consultants believe that the Founders have not substantially performed their material obligations hereunder, and the Founders fail to resume substantial performance of their material obligations on a continuous basis within fourteen (14) days of receiving such demand; provided, that if it is not reasonably possible for the Founders to resume such substantial performance within such fourteen (14) day time period, then such time period shall be extended to that minimum period of time during which it is reasonably possible for the Founders to resume such substantial performance.

## ARTICLE II

## COMPENSATION

2.1    Compensation.  Each of the Founders, upon execution of this Agreement, will transfer and convey (or present satisfactory evidence of prior transfer and conveyance in the case of membership interests of ITP) the securities described in Exhibit A, attached hereto (the **"Securities"**), to CGTF General Partnership, an Illinois general partnership which is wholly-owned by the Consultants ("CGTF"), in consideration for the Consultants' Services to be performed hereunder (the **"Consulting Fee"**). The Securities will be governed in all respects by any Articles of Incorporation, By-Laws, Shareholders' Agreements, Registration and/or Information Rights Agreements, Operating Agreements or other Agreements to which the Securities are subject. The Founders and the Consultants agree that the Securities shall be transferred contemporaneously with the execution of this Agreement and such Securities shall be deemed fully earned by the Consultants upon such transfer.

3

2.2    Additional Fee. In addition to the Consulting Fee, each Founder, severally and not jointly, agrees that during the Consulting Period, such Founder shall use his best efforts to ensure that CGTF receives or is afforded the reasonable opportunity to purchase, as the case may be, an equal interest to the interests received by a Founder or Founders of the initially issued stock or equity interest, computed on a fully-diluted basis after such entity's initial round of equity financing, of any newly formed entity in which such Founder or Founders is an initial shareholder or equity owner, on the same terms and conditions upon which the Founder acquires such equity interest.

(Example 1: if the three Founders establish a company and would, if not for this Agreement, collectively receive 24% of the initially issued stock, each Founder shall use his best efforts to ensure that CTGF receives 6% of the initially issued stock of such company on the same terms and conditions as the other Founders, with the Founders receiving the remaining 18%; Example 2: if two of the three Founders are initial investors and would, if not for this Agreement, receive 36% of the initially issued stock, each of the two Founders shall use his best efforts to cause such company to issue to CGTF 12% of its initially issued stock on the same terms and conditions as the two Founders, with the two Founders receiving the remaining 24%. Example 3: if one of the Founders establishes a company and, if not for this Agreement, would receive 50% of such company's stock, such Founder shall use his best efforts to cause such company to issue to CGTF 25% of the stock on the same terms and conditions as such Founder, with such Founder receiving the remaining 25%.

2.3.    Expenses. The Founders shall use their best efforts to cause each Company to reimburse the Consultants for all of their out-of-pocket expenses incurred by them related to their Services for the benefit of such Company hereunder that were authorized or subsequently approved by such Company. In addition, the Founders shall use their best efforts to cause each Company reimburse the Consultants for all reasonable expenses related to attending and participating in, on such Company's behalf, industry related activities, trade organizations and associations.

## ARTICLE III

## MISCELLANEOUS

3.1    Conflicts. The Consultants hereby warrant and represent that they are not under any legal or contractual obligation that would conflict in any manner with the obligations and duties they are undertaking herein, and that the execution of this Agreement will not breach any Agreement to which either of the Consultants is now a party.

3.2    Notices. All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given, delivered and received (a) when delivered, if delivered personally, (b) four days (4) after mailing, when sent by registered or certified mail, return receipt request and postage prepaid, (c) one (1) business day after delivery to a private courier service, when delivered to a private courier service providing

documented overnight service, and (d) on the date of delivery by telecopy, receipt confirmed, provided that a confirmation copy is sent on the next business day by first class mail, postage prepaid, in each case addressed as follows:

| If to Consultants: | With a copy to: |
|---|---|
| Carl C. Greer<br>1260 Midwest Lane<br>Wheaton, IL 60187 | Wildman Harrold Allen and Dixon<br>225 West Wacker Drive<br>Suite 3000<br>Chicago, IL 60606<br>Attn: John Eisel<br>Ph:  (312) 201-2000 |
| Tom Floyd<br>150 Shady Lane<br>Bartlett, IL  60103 | |

If to any Company or any Founder:

[Name of Company]
311 South Wacker St.
Suite 1650
Chicago, IL  60606
Attn: [Name of Founder]
Ph:  (312) 377- 5300

Any party may change its address for purposes of this paragraph by giving the other party written notice of the new address in the manner set forth above.

3.3     Entire Agreement; Amendments, Etc.  This Agreement contains the entire agreement and understanding of the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof.  No modification, amendment, waiver or alteration of this Agreement or any provision or term hereof shall in any event be effective unless the same shall be in writing, executed by both parties hereto, and any waiver so given shall be effective only in the specific instance and for the specific purpose for which given.

3.4     No Waiver.  No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder or pursuant hereto shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder or pursuant thereto.

3.5     Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law but, if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.   If any part of any covenant or other provision in this Agreement is

determined by a court of law to be overly broad thereby making the covenant unenforceable, the parties hereto agree, and it is their desire, that the court shall substitute a judicially enforceable limitation in its place, and that as so modified the covenant shall be binding upon the parties as if originally set forth herein.

3.6   Compliance and Headings.  The headings in this Agreement are intended to be for convenience and reference only, and shall not define or limit the scope, extent or intent or otherwise affect the meaning of any portion hereof.

3.7   Governing Law.  The parties agree that this Agreement shall be governed by, interpreted and construed in accordance with the laws of the State of Illinois, and the parties agree that any suit, action or proceeding with respect to this Agreement shall be brought in the courts of Cook County in the State of Illinois or in the U.S. District Court for the Northern District of Illinois.  The parties hereto hereby accept the exclusive jurisdiction of those courts for the purpose of any such suit, action or proceeding.  Venue for any such action, in addition to any other venue permitted by statute, will be Cook County, Illinois.  All parties hereto waive their right to trial by jury with respect to the adjudication of any dispute hereunder.

3.8   Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument.

3.9   Recitals.  The Recitals set forth above are hereby incorporated in and made a part of this Agreement by this reference.

3.10   Consultants' Performance and Execution.  The Consultants represent and warrant to the Founders that the execution and performance of this Agreement has been or will be duly authorized by the Consultants and that, upon execution by the Consultants and the Founders, this Agreement will constitute a valid obligation enforceable against the Consultants in accordance with its terms.

3.11   Affiliates.  For purposes of this Agreement, the term "Affiliate" shall mean with respect to any person or entity (a "**Person**") (i) any Person who directly or indirectly controls, is controlled by or is under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person, (iii) any member, manager, director or general partner of such Person, or (iv) any Person who is a member, manager, director, general partner, trustee or holder of ten percent (10%) or more of the voting interests of any Person described in Clauses (i) through (iii) of this sentence or any ancestor, descendant or collateral of any natural person described in clauses (i) through (iii) of this sentence who is no more remote than a first cousin of such natural person.  For purposes of this definition, the term "controls", "is controlled by" or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

**Article IV**
**Securities Representations**

4.    <u>Securities Representations and Warranties</u>. Consultants hereby represent and warrant to Founders that the following statements are true and correct as of the date hereof:

4.1    The CIDC Common Stock, WDH Class A Stock and ITP Class A Units being acquired hereunder are being acquired by Consultants (with title held by CGTF) for their own accounts and for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. No one other than CGTF has any interest in, or any right to acquire, the CIDC Common Stock, WDH Class A Stock or ITP Class A Units being acquired by Consultants hereunder.

4.2    Each Consultant is an "accredited investor" as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act").

4.3    Each Consultant has the financial ability to bear the economic risk of the CIDC Common Stock, WDH Class A Stock or ITP Class A Units being acquired by Consultants hereunder, has no need for liquidity in such investments and could afford a complete loss of such investments.

4.4    Each Consultant has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the CIDC Common Stock, WDH Class A Stock or ITP Class A Units being acquired by Consultants hereunder.

4.5    Each Consultant has been given a full opportunity to ask questions of, and to receive answers from, ITP concerning the terms and conditions of the ITP Operating Agreement and the business of the ITP, WDH concerning the Certificate of Incorporation and the business of WDH, and CIDC concerning the CIDC Shareholders' Agreement and the business of CIDC, and to request such other information be provided as he desired in order to evaluate ITP, WDH and CIDC and the ITP Class A Units, WDH Class A Stock, and CIDC Common Stock, and all such information requests have been met to his full satisfaction. They have also been furnished a copy of the ITP Operating Agreement, WDH Certificate of Incorporation, CIDC Shareholders' Agreement and CIDC's Confidential Information Memorandum, as amended and supplemented (the "Memorandum"). Each of them has been offered the opportunity to review the documents listed on Exhibit B, attached hereto and made a part hereof. Each of them has been given a full opportunity to ask questions of, and to receive answers from, ITP concerning the terms and conditions of the ITP Operating Agreement and the business of ITP, WDH concerning the WDH Certificate of Incorporation and the business of WDH, and CIDC concerning the CIDC Shareholders' Agreement and Memorandum and the business of CIDC, and to obtain such other information as he desired in order to evaluate ITP and the ITP Class A Units, WDH and the WDH Class A Stock, and CIDC and the CIDC Common Stock, and all such questions have been answered to his full satisfaction. In making their decision to enter into this Agreement, Consultants have relied solely upon

Class A Stock, and ITP Class A Units being acquired hereunder have not been registered under the Securities Act, or the securities laws of any state, in reliance upon specific exemptions from registration thereunder, and agrees that such CIDC Common Stock, WDH Class A Stock, and ITP Class A Units may not and shall not be sold, offered for sale, transferred, pledged, hypothecated or otherwise disposed of except in compliance with the Securities Act and applicable state securities laws. Each Consultant acknowledges that there is not and may never be any market for resale of the CIDC Common Stock, WDH Class A Stock, or ITP Class A Units.

4.7    Each Consultant understands and acknowledges that no federal or state agency has made any finding or determination as to the fairness of an investment in, or any recommendation or endorsement of, CIDC Common Stock, WDH Class A Stock, or ITP Class A Units.

**IN WITNESS THEREOF**, each of the parties hereto has caused this Agreement to be executed and delivered as of the day and year first above written.

**CONSULTANTS:**

_Carl C. Greer_
Carl Greer

_Thomas O. Floyd_
Tom Floyd

**FOUNDERS:**

_____
Keith Daubenspeck

_____
Dwight Badger

_____
Lee Wiskowski

8

their own investigation of the information contained in the documents described in this paragraph and upon the independent investigations made by them. They have received no representation or warranty from Founders, WDH, CIDC, ITP any of their respective affiliates, employees or agents, except as expressly stated herein.

4.6    Each Consultant acknowledges that the CIDC Common Stock, WDH Class A Stock, and ITP Class A Units being acquired hereunder have not been registered under the Securities Act, or the securities laws of any state, in reliance upon specific exemptions from registration thereunder, and agrees that such CIDC Common Stock, WDH Class A Stock, and ITP Class A Units may not and shall not be sold, offered for sale, transferred, pledged, hypothecated or otherwise disposed of except in compliance with the Securities Act and applicable state securities laws. Each Consultant acknowledges that there is not and may never be any market for resale of the CIDC Common Stock, WDH Class A Stock, or ITP Class A Units.

4.7    Each Consultant understands and acknowledges that no federal or state agency has made any finding or determination as to the fairness of an investment in, or any recommendation or endorsement of, CIDC Common Stock, WDH Class A Stock, or ITP Class A Units.

IN WITNESS THEREOF, each of the parties hereto has caused this Agreement to be executed and delivered as of the day and year first above written.

CONSULTANTS:

_____

Carl Greer

_____

Tom Floyd

FOUNDERS:

_____
Keith Daubenspeck

_____
Dwight Badger

8

Lee Wiskowski

EXHIBIT A
TO
CONSULTING SETTLEMENT

## TRANSFER OF STOCK AND MEMBERSHIP INTERESTS

An aggregate of 300,000 shares of CIDC common stock shall be transferred to Consultants (representing 6% of 5,000,000 shares of CIDC capital stock, fully diluted); an aggregate of 48 shares of WDH Class A common Stock shall be transferred to CGTF (representing approximately 4.9% of 988 shares of WDH capital stock, fully diluted); an aggregate of 250 Class A Membership Interests have been issued by ITP to Greer, representing 2.5% of the Class A Membership Interests in ITP, fully diluted). These securities shall be transferred to CGTF by the Founders, or ITP as the case may be, as follows:

From:

Daubenspeck:  100,000 shares of CIDC common stock; 16 shares of WDH Class A common stock.

Wiskowski: 100,000 shares of CIDC common stock ; 16 shares of WDH Class A common stock.

Badger: 100,000 shares of CIDC common stock; 16 shares of WDH Class A common stock.

From ITP: 250 Class A Membership Interests (previously issued Greer).

10

# Exhibit B

## AMENDMENT NO. 1 TO CONSULTING AGREEMENT

This Amendment No. 1 (the "Amendment") dated October 17, 2001 is made to the Consulting Agreement (the "Agreement") dated September 18, 2000 by and among Keith Daubenspeck, Dwight Badger, and Lee Wiskowski (each a "Founder" and collectively the "Founders") and Carl C. Greer and Tom Floyd (the "Consultants").

### RECITALS:

A.     The Founders and Consultants desire to extend the term of the Agreement;

B.     The Consultants are prepared to extend the term of the Agreement in exchange for the consideration referenced in this Amendment;

**NOW, THEREFORE,** in consideration of the foregoing and the agreements, covenants and conditions set forth herein, the Consultants and the Founders hereby agree as follows:

1.     <u>Term</u>. The second sentence of Section 1.1 of the Agreement is hereby amended and restated as follows:

> The term of this Agreement shall be for three (3) years and ten (10) months, commencing on the date hereof (the **"Consulting Period"**) provided, however, the Founders shall have the right to terminate this Agreement effective immediately upon written notice for "Just Cause" (as hereinafter defined).

2.     <u>Compensation.</u>   Keith Daubenspeck and Dwight Badger, upon execution of this Amendment, will transfer and convey the Securities described in Exhibit I, attached to this Amendment, to either CGTF General Partnership or to Carl C. Greer and Tom Floyd as indicated on Exhibit I. The Securities will be subject to and governed in all respects by any Articles of Incorporation, By-Laws, Shareholders' Agreements, Registration and/or Information Rights Agreements, Operating Agreements and other Agreements. The Founders and the Consultants agree that the Securities shall be transferred contemporaneously with the execution of this Agreement, Amendment and such Securities shall be deemed fully earned by the Consultants upon such transfer. Keith Daubenspeck and Dwight Badger represent and warrant that the warrants listed on Exhibit I are the only transactions where they or their affiliates have received warrants as part of their compensation as of the date of this Agreement arising out of transactions involving the companies listed on Exhibit I.

3.     <u>The Agreement's Continuing Force and Effect</u>. In all other respects the terms and conditions of the Agreement shall remain in full force and effect without revision or modification.

**IN WITNESS THEREOF**, each of the parties hereto has caused this Amendment to be executed and delivered as of the day and year first above written.

<u>**CONSULTANTS:**</u>

_____
Carl C. Greer

_____
Tom Floyd

<u>**FOUNDERS**</u>:

_____
Keith Daubenspeck

_____
Dwight Badger

_____
Lee Wiskowski

**EXHIBIT I**

to

**Amendment No. 1 to Consulting Agreement**

1.  A ten percent (10%) interest in all existing warrants and warrants resulting from transactions which are initiated on or before the termination of this Agreement granted or allocated to Keith Daubenspeck and Dwight Badger in their capacity as sales persons and a fifteen percent (15%) interest in all other existing warrants and warrants resulting from transactions which are initiated on or before the termination of this Agreement granted or allocated to Keith Daubenspeck and Dwight Badger arising out of transactions involving WD Holdings Corp., Advanced Equities, Inc., Innovative Technology Partners, G.P., L.L.C., Innovative Technology Partners, L.P. and Communications Infrastructure Development Corporation and any subsidiary or affiliate of such entities including but not limited to warrants in the following companies:

> Warrants to purchase 51,210 shares of Netdelivery Corporation
> Warrants to purchase 151,585 shares of Arbinet-thexchange, Inc.
> Warrants to purchase 3200 shares of Bias Power Technology, Inc.
> Warrants to purchase 7464 shares of Universal Access, Inc.

These warrants shall be transferred to CGTF General Partnership. An assignment for the Netdelivery Corporation and Arbinet-thexchange, Inc. warrants will be delivered at the time of the execution of this Agreement. The assignment of the warrants for Bias Power Technology, Inc. and Universal Access, Inc. shall be made at such time as any of the parties reasonably believes that such warrants have value.

2.  A twenty percent (20%) interest in Innovative Technology Partners, G.P., L.L.C. These interests shall be transferred to CGTF General Partnership.

# Exhibit C

## AMENDMENT NO. 2 TO CONSULTING AGREEMENT

This Amendment No. 2 (the "Amendment") dated March 31, 2002 is made to the Consulting Agreement (the "Agreement") dated September 18, 2000 by and among Keith Daubenspeck, Dwight Badger, and Lee Wiskowski (each a "Founder" and collectively the "Founders") and Carl C. Greer and Tom Floyd (the "Consultants") as amended by Amendment No. 1 dated October 17, 2001.

### RECITALS:

A.    The Founders and Consultants desire to amend the Agreement;

·B.    The Founders and Consultants are prepared to amend the Agreement in exchange for the consideration referenced in this Amendment;

**NOW, THEREFORE,** in consideration of the foregoing and the agreements, covenants and conditions set forth herein, the Consultants and the Founders hereby agree as follows:

1.    Recital E of the Agreement is hereby amended and restated as follows:

E.    The Founders own direct or indirect equity interests in the following entities: WD Holdings Corp. (**"WDH"**), Advanced Equities, Inc., Innovative Technology Partners, G.P., L.L.C., (**"ITP"**) Innovative Technology Partners, L.P. and Communications Infrastructure Development Corporation (**"CIDC"**) and their Affiliates (collectively, the **"Companies"**).

2.    Section 1.1 of the Agreement is hereby amended and restated as follows:

1.1    <u>Position; Term; Responsibilities.</u>  The Founders hereby engage the Consultants to perform the consulting services described herein and the Consultants hereby agree to render such services, upon the terms and conditions set forth herein.  The term of this Agreement shall commence on the date of this Agreement and end on January 31, 2006 (the **"Consulting Period"**) provided, however, the Founders shall have the right to terminate this Agreement effective immediately upon written notice for "Just Cause" (as hereinafter defined). For purposes of this Agreement "**Just Cause**" shall mean any of the following:

(a)    Either of the Consultants knowingly participates or engages in any act or fraud, embezzlement, or theft against the Founders, the Companies, or any of their Affiliates (regardless of whether such act results in a criminal conviction);

(b)     Either of the Consultants is convicted by a court of proper jurisdiction of any crime involving an act of dishonesty or breach of trust or of a felony (other than a traffic violation);

Any termination by reason of the foregoing shall not limit or preclude any other right or remedy that the Founders may have under this Agreement or otherwise. In the event of termination of this Agreement by the Founders pursuant to this section, the Consultants shall not be entitled to any further compensation or benefits under this Agreement for periods thereafter, except as otherwise provided in this Agreement.

3.    Section 2.1 of the Agreement is hereby amended and restated as follows:

2.1    Compensation.  Each of the Founders will transfer and convey the securities described in Exhibit A and the Companies, Keith Daubenspeck and Dwight Badger will transfer and convey the securities described in Exhibit I (together, the **"Securities"**), to CGTF General Partnership, an Illinois general partnership which is wholly-owned by the Consultants ("CGTF"), in consideration for the Consultants' Services to be performed hereunder (the **"Consulting Fee"**). The Securities will be subject to and governed in all respects by any Articles of Incorporation, By-Laws, Shareholders' Agreements, Registration and/or Information Rights Agreements, Operating Agreements or other Agreements to which the Securities are subject. The Companies and the Consultants agree that the Securities listed in Exhibit A were or shall be transferred effective on or before September 18, 2000 and the Securities listed on Exhibit I shall be transferred effective as of the date they are received by the Founders and such Securities shall be deemed fully earned by the Consultants upon the effective date of such transfer. All Securities listed on Exhibit A which have not yet been delivered and the twenty percent (20%) interest in Innovative Technology Partners, G.P., L.L.C. listed on Exhibit I shall be delivered to Consultants no later than April 30, 2002. Keith Daubenspeck and Dwight Badger represent and warrant that the warrants listed in paragraph 1 of Exhibit I are the only transactions where they or the Companies have received warrants as of the date of this Amendment No. 2 arising out of transactions involving the Companies.

4.    A new Section 3.12 is hereby added to this Agreement as follows:

3.12    Books and Records.   On the first day of each calendar quarter, Keith Daupenspeck and Dwight Badger shall provide the Consultants with a list of all Securities received by the Companies during the prior calendar quarter together with a list of all pending transactions from which it is contemplated that Securities may be issued to the

Companies and for which an Offering Memorandum or Offering Circular has been prepared. Up to two times per year (and with at least five days prior notice), the Consultants and their representatives shall be provided with access to the books and records of the Companies during regular business hours. Consultants and their representatives may examine corporate and financial records of the Companies and make copies thereof or extracts therefrom and may discuss the affairs, finances and accounts of any of the Companies with the directors, officers, key employees and independent accountants of the Companies. In addition, upon their request the Consultants and their representatives shall be provided with copies of all documentation relating to transactions in which it is contemplated that Securities may be issued to the Companies.

5.    <u>The Agreement's Continuing Force and Effect</u>.    In all other respects the terms and conditions of the Agreement shall remain in full force and effect without revision or modification.

**IN WITNESS THEREOF**, each of the parties hereto has caused this Amendment to be executed and delivered as of the day and year first above written.

**CONSULTANTS:**

_____
Carl C. Greer

_____
Tom Floyd

**FOUNDERS**:

_____
Keith Daubenspeck

_____
Dwight Badger

_____
Lee Wiskowski

3

Companies and for which an Offering Memorandum or Offering Circular has been prepared. Up to two times per year (and with at least five days prior notice), the Consultants and their representatives shall be provided with access to the books and records of the Companies during regular business hours. Consultants and their representatives may examine corporate and financial records of the Companies and make copies thereof or extracts therefrom and may discuss the affairs, finances and accounts of any of the Companies with the directors, officers, key employees and independent accountants of the Companies. In addition, upon their request the Consultants and their representatives shall be provided with copies of all documentation relating to transactions in which it is contemplated that Securities may be issued to the Companies.

5.    <u>The Agreement's Continuing Force and Effect</u>.    In all other respects the terms and conditions of the Agreement shall remain in full force and effect without revision or modification.

**IN WITNESS THEREOF**, each of the parties hereto has caused this Amendment to be executed and delivered as of the day and year first above written.

<u>**CONSULTANTS:**</u>

_____
Carl C. Greer

_____
Tom Floyd

<u>**FOUNDERS**</u>

_____
Keith Daubenspeck

_____
Dwight Badger

_____
Lee Wiskowski

3

**EXHIBIT I**

to

**Amendment No. 2 to Consulting Agreement**

1. A ten percent (10%) interest in all equity grants, warrants, options or other derivative securities which have been received by the Companies and allocated to Keith Daubenspeck and Dwight Badger in their capacity as sales persons on or before the date of this Amendment No. 2 and a fifteen percent (15%) interest in all other equity grants, warrants, options or other derivative securities which have been received by the Companies and allocated to Keith Daubenspeck and Dwight Badger on or before the date of this Amendment No. 2 arising out of transactions involving the Companies including but not limited to warrants in the following companies:

> Warrants to purchase 51,210 shares of Netdelivery Corporation
> Warrants to purchase 151,585 shares of Arbinet-thexchange, Inc.
> Warrants to purchase 3200 shares of Bias Power Technology, Inc.
> Warrants to purchase 7464 shares of Universal Access, Inc.

An assignment for the Netdelivery Corporation and Arbinet-thexchange, Inc. warrants will be delivered as soon as practicable after the execution of this Amendment No. 2. The assignment of the warrants for Bias Power Technology, Inc. and Universal Access, Inc. shall be made at such time as any of the parties reasonably believes that such warrants have value.

2. A twenty percent (20%) interest in Innovative Technology Partners, G.P., L.L.C.

3. A three percent (3%) interest in all of the equity grants, warrants, options or other derivative securities (before allocation to any other person) received by the Companies on or after the date of this Amendment No. 2 and arising out of transactions initiated before the termination of this Agreement including but not limited to warrants in the following companies:

> Centerpoint Broadband Technologies, Inc.
> VisionTek, L.L.C.
> Source Precision Medicine, Inc.

4. A fifteen percent (15%) interest in all equity grants, warrants, options or other derivative securities received by the Companies and allocated to Keith Daubenspeck and Dwight Badger in their capacity as sales persons on or after the date of this Amendment No. 2 and arising out of transactions initiated before the termination of this Agreement and a twenty percent (20%) interest in all other equity grants, warrants, options or other derivative securities which are received by the Companies and allocated to Keith Daubenspeck and Dwight Badger on or after the date of this Amendment No. 2 and arising out of transactions initiated before the termination of this Agreement including but not limited to warrants in the following companies:

> Centerpoint Broadband Technologies, Inc.
> VisionTek, L.L.C.
> Source Precision Medicine, Inc.