**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CARL C. GREER and** | ) | |
| **THOMAS A. FLOYD,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | No.     08 C 4958 |
| | ) | **Judge Blanche M. Manning** |
| | ) | |
| **ADVANCED EQUITIES, INC.,** | ) | |
| **KEITH DAUBENSPECK, and** | ) | |
| **DWIGHT BADGER,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

This is a case about alleged fraud in the sale and transfer of securities.  After this court

granted the defendants' motion to dismiss the Corrected Amended Complaint ("CAC") in part

and allowed the plaintiffs to replead, the plaintiffs filed a Second Amended Complaint ("SAC").

The plaintiffs, Carl Greer and Thomas Floyd, allege that they purchased stock in a company

called Pixelon, Inc. on the advice of defendants Keith Daubenspeck and Dwight Badger, two

officers at defendant Advanced Equities, Inc. ("AEI").  According to the SAC, the defendants

induced Greer and Floyd to invest money through AEI "knowing all the while that Pixelon

management was crooked and its financials fraudulent."

As in the CAC, the SAC includes three counts under federal securities laws:  Count III

alleges a violation under Section 12(a)(2) of the Securities Act of 1933 and Counts IV and V

allege violations under Section 10(b) of the Securities Exchange Act of 1934.  The remaining

three counts allege state law claims for breach of contract, breach of fiduciary duty, and common

law fraud.  Again, the defendants have moved to dismiss the federal securities law counts on the

ground that they are not pleaded with sufficient particularity.  The defendants further move to

dismiss the state law claims on the ground that the court should decline to exercise supplemental jurisdiction given the failure of the federal claims. For the reasons stated below, the motion to dismiss is granted.

## I.    Background

The plaintiffs' well-pled allegations are accepted as true. In the fall of 1999, the defendants' salesman, Paul Wilkowski, contacted the plaintiffs to become AEI's customers. Daubenspeck, Badger, and AEI ultimately advised the plaintiffs on investment opportunities and they relied on this advice to invest a total of $4,083,345 in several opportunities, including Pixelon, Inc.

Wilkowski told the plaintiffs that Pixelon was an up-and-coming company and its founder, David Stanley, had developed a special technology that would be the first to provide "TV-quality internet broadcasts." According to the plaintiffs, Wilkowski also told them that AEI was "significantly involved with Pixelon" and they planned to have several AEI members on Pixelon's board. In addition, Daubenspeck, Badger and Wilkowski told the plaintiffs that AEI had worked with Pixelon for several months and had access to the company's books and records. Daubenspeck and Badger told Greer that they invested in Pixelon, and they urged Greer and Floyd to do the same.

On August 25, 1999, AEI issued an Amended and Restated Private Placement Memorandum ("Placement Memorandum") to solicit investors to purchase Pixelon Series A Preferred Stock. The Placement Memorandum stated that the offering was intended to raise $20,650,000, which would finance Pixelon's operations through approximately June 1, 2000. The original offering, however, only raised $18,172,000. (SAC ¶ 48.) The Placement

Memorandum also stated that they would launch Pixelon in October 1999 with a concert that would cost $7,000,000. In addition, the Placement Memorandum restated Stanley's role within Pixelon and in developing its technology. The plaintiffs later discovered that Stanley was a convicted embezzler and fugitive. Moreover, in May 2000, Pixelon admitted that its technology was merely an adaptation of a common Windows Media Player program.

Before that, however, on October 22, 1999, Greer purchased 1,080,000 shares of Pixelon Series A Preferred Stock for $1,890,000 and Floyd purchased 30,000 shares of Pixelon Series A Preferred Stock for $52,500. The plaintiffs allege that neither Greer nor Floyd knew about Pixelon's technology or Stanley's criminal history.

Later, in November 1999, Wilkowski approached Greer for more money. He asked Greer to consider lending Pixelon an additional $1,000,000, but Greer refused. A few days later, Wilkowski told Floyd that Stanley was going to be terminated.

On December 9, 1999, AEI issued a Supplement to the Placement Memorandum. In the Supplement, AEI requested an additional $21,500,000 to fund its operations through June 1, 2000. The Supplement revealed that: Pixelon's capitalization had changed; the launch event cost over $15 million instead of $7 million as initially stated; there were nine previously undisclosed material contracts; Stanley was terminated for mismanagement and had been awarded additional shares of stock than the amount disclosed in the Placement Memorandum; Pixelon was involved in litigation with various employees and several executives had resigned; and Pixelon borrowed an additional $3.55 million from investors in October and November 1999.

In December 1999, Greer and Floyd met with defendants about their investment in Pixelon. They told defendants that the Supplement's disclosures concerned them, and after

Daubenspeck and Badger acknowledged plaintiffs' concerns, they promised to find ways to make Greer and Floyd whole. In September 2000, while the defendants indicated that they could not give the plaintiffs their money back, they proposed a consulting agreement that would allow the plaintiffs to recoup their money. According to the plaintiffs, in addition to compensating them for their initial investment, defendants' consulting agreement included the transfer of certain securities and equity interests to the plaintiffs in consideration for their not filing suit against the defendants. The plaintiffs allege that in addition to the fraudulent representations and omissions made to them to induce them to make their initial investment in Pixelon, the defendants did not perform their obligations under the consulting agreement.

Additional allegations will be discussed in the order as necessary.

## II. Standard

Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. To state such a claim, the complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court accepts the allegations in the complaint as true, viewing all facts, as well as any inferences reasonably drawn therefrom, in the light most favorable to the plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000).

The Seventh Circuit has recently synthesized the relevant Supreme Court caselaw as follows:

> So, what do we take away from *Twombly*, *Erickson*, and *Iqbal*? First, a plaintiff must provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual

allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.

*Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

Moreover, the Brooks court stated that the "plausibility requirement applies across the board, not just to antitrust cases." *Id.* However, the court should also take into consideration the complexity of the case when addressing whether a complaint alleges sufficient facts. *See Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 803 (7th Cir. 2008) (amount of factual allegations required to state a plausible claim "will depend on the type of case" and "[i]n a complex antitrust or RICO case a fuller set of factual allegations than found in the sample complaints in the civil rules' Appendix of Forms may be necessary"). To be facially plausible, a plaintiff must plead factual content that "allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

## III.    Analysis

Prior to beginning its analysis of the defendants' arguments, the court addresses several general arguments made by the defendants as to why the plaintiffs' SAC is deficient. Two of the defendants' bases for dismissal (that certain of the allegations are not material and that the plaintiffs have failed to plead loss causation with respect to the Rule 10b-5 claim) are set forth in footnote number 2 of their opening memorandum. In their reply brief, the defendants fault the plaintiffs for having failed to address these arguments and contend that the plaintiffs have forfeited their right to address them. *See* Reply at 5-6, Dkt. #51. However, arguments raised only in footnotes are forfeited. *United States v. White*, 879 F.2d 1509, 1513 (7th Cir.

1989)("[B]y failing to raise this issue other than by a passing reference in a footnote, [the defendant] has waived it.").  As such, the court will not address these two arguments.

In addition, the defendants take issue with the assertions of a conspiracy, which were made for the first time in the plaintiffs' response to the motion to dismiss the SAC.  The court addresses this argument in Section III.A.2. of this order.

Finally, the defendants argue that the plaintiffs' allegations that the defendants "knew of," or "should have known" that their representations were false or that they "condoned" unlawful conduct are too conclusory to credit.  *See Iqbal*, 129 S. Ct. at 1951 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").  The court agrees that the plaintiffs' allegations in this regard are not sufficiently supported by facts.  The court addresses this issue in more detail under its discussion of scienter in Section III.B. of this order.

A.     **Count III–Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l**

Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l, creates liability for any person who "offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, [or] by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. . . ."  The plaintiffs allege the defendants made numerous misleading statements and omitted numerous material facts in the Placement Memorandum and through oral communications when they offered and sold Pixelon Series A Preferred Stock. (SAC at 148-156).

1.      <u>Does Rule 9(b) apply to the 12(a)(2) claim</u>?

As noted above, the defendants first argue that the plaintiffs have failed to plead the fraud alleged in the § 12(a)(2) claim with particularity as required under Fed. R. Civ. P. 9(b). The plaintiffs do not deny that Rule 9(b) applies to the § 12(a)(2) challenge; instead, they assert that their allegations meet the Rule 9(b) standard for specificity as related to the fraud allegations.

While not directly raised by the parties, the court notes that whether § 12(a)(2) claims are governed by Rule 9(b)'s specificity requirements is not a settled issue. While some courts have concluded that Rule 9(b)'s particularity requirement applies to § 12(a)(2) claims, other courts have rejected that conclusion on the ground that § 12(a)(2) imposes strict liability for misstatements in a prospectus or registration statement. Because neither fraud nor scienter is an element of a § 12(a)(2) claim, some courts have concluded that a plaintiff should not be required to plead what it need not prove. *See, e.g.*, Brian Murray & Donald J. Wallace, *You Shouldn't Be Required to Plead More Than You Have to Prove*, 53 Baylor L. Rev. 783 (2001)("Baylor Law Review Article"), and cases cited therein. *See also In Re Ulta Salon, Cosmetics & Fragrance, Inc. Securities Litigation*, 604 F. Supp. 2d 1188, 1193 (N.D. Ill. 2009)("Such a 'pleading standard which requires a party to plead particular facts to support a cause of action that does not include fraud or mistake as an element comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in the Federal Rules of Civil Procedure.'")(citation omitted).

The Seventh Circuit has not spoken directly on the issue although its decision in *Sears v. Liken*, 912 F.2d 889 (7th Cir. 1990), has been construed, including by this court in its order on the defendants' motion to dismiss the Corrected Amended Complaint in the instant case, as

affirming dismissal of a § 12(a)(2) claim because of the plaintiffs' failure to plead the claim with particularity under Rule 9(b).  Some authority questions this interpretation of the *Sears* case.  *See* Baylor Law Review Article at 795-98 ("The court offered no justification for why Securities Act claims should be subject to Rule 9(b) nor did it state that the plaintiffs had alleged fraud in the Securities Act claims.").  *See also In Re Ulta Salon Securities Litig*., 604 F. Supp. 2d at 1993 (stating that the Seventh Circuit in *Sears* "was not asked to and did not determine that Rule 9(b) applies to § 11 and 12 claims even if those claims 'sound in fraud.'").

Regardless of how one interprets the holding of *Sears*, the court concludes that the allegations supporting the plaintiffs' § 12(a)(2) claim in this case are subject to the heightened pleading standard of Rule 9(b).  As an initial matter, Rule 9(b) applies to all allegations of fraud, not just claims of fraud.  Fed. R. Civ. P. 9(b)("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  *See also Borsellino v. Goldman Sachs Group, Inc*., 477 F.3d 502, 507 (7th Cir. 2007)("Rule 9(b) applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations").[1]  Moreover, "because Rule 9(b) only excises deficient averments of fraud from a complaint (and does not provide an independent basis for dismissal), failure to satisfy Rule 9(b) does not necessarily sound a death knell."  *Siegel v. Shell Oil Co.*, 480 F. Supp.2d 1034, 1040 (N.D. Ill. 2007).  Nevertheless, "if, while the [applicable] statute or common law doctrine doesn't require proof of fraud, only a fraudulent violation is charged, failure to comply with Rule 9(b)

---

[1]Rule 9(b) was amended in 2007, after *Borsellino*, to make it "more easily understood and to make style and terminology consistent throughout the rules."  Fed. R. Civ. P. Advisory Committee Notes (2007 Amendment).  Thus, the rule now refers to "allegations" instead of "averments."  The amendments were "intended to be stylistic only" and thus do not affect the Seventh Circuit's interpretation of the rule in *Borsellino*.  *Id*.

requires dismissal of the entire charge." *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003)(citations omitted).

Although § 12(a)(2) does not require allegations of fraud, the plaintiffs' allegations with respect to their § 12(a)(2) claim are in fact all based on alleged fraud. Specifically, the plaintiffs state in their response to the motion to dismiss that:

> Counts III and IV (Section 12(2) and 10(b) claims) arise out of the same operative facts. Greer and Floyd allege that Defendants Advanced Equities, Daubenspeck, and Badger (either directly or through their agent Wilkowski) *fraudulently made a series of misrepresentations of material fact and intentionally failed to disclose material facts* to Greer and Floyd to induce [them] to invest almost $2 million in Pixelon.

Response at 7, Dkt. #50 (emphasis added). Thus, if the plaintiffs' allegations fail to satisfy Rule 9(b)'s requirements, then the court must dismiss the Section 12(a)(2) claim.

### 2. Rule 9(b) Requirements

When a plaintiff alleges fraud or mistake, Fed. R. Civ. P. 9(b) requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." To do this, the "complaint must specify the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990). In other words, Rule 9(b) requires the "who, what, when, where, and how" of the circumstances of the fraud or mistake. *Tillman v. U.S. Energy Sav. Corp.*, No. 08 C 1641, 2008 WL 2754813, at *3 (N.D. Ill. Jul. 14, 2008)(citation omitted). Furthermore, a fraud claim is properly dismissed when it fails to allege the required who, what, when, where, and how, even if the claim includes specific details of the fraud itself. *See Windy City Metal Fabricators & Supply, Inc. v. CIT*

*Technical Fin. Serv., Inc.*, 536 F.3d 663, 668-69 (7th Cir. 2008). "By requiring the plaintiff to allege the who, what, where, and when of the alleged fraud, the rule requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467 (7th Cir. 1999)(citation omitted).

The plaintiffs allege that the defendants and Wilkowski made misrepresentations and omissions in the Placement Memorandum and oral communications through four fraudulent material misrepresentations and five material omissions to induce plaintiffs to invest in Pixelon. Specifically, the plaintiffs allege that the defendants fraudulently misrepresented that: (1) Pixelon's technology was new, novel, and proprietary (Opp. at 6); (2) the Pixelon launch event would only cost $7 million dollars (Opp. at 8); (3) $20,650,000 was sufficient to operate Pixelon through June 1, 2000 (Opp. at 9); and (4) Daubenspeck and Badger invested their own money in Pixelon (Opp. at 10). In addition the plaintiffs allege that the defendants intentionally omitted that: (1) Pixelon's founder, Stanley, was a convicted felon; (2) Pixelon had sought and obtained additional bridge financing; (3) there were previously undisclosed material contracts; (4) Pixelon was involved in litigation and other disputes with its employees; and (5) Stanley had additional options and warrants to purchase Pixelon stock.

      a.      *Allegations that "separate fraud from the benefit of hindsight"*

The court dismissed the Rule 12(a)(2) claim in the previous complaint because the plaintiffs failed to allege "circumstances that might separate fraud from the benefit of hindsight." *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990). The court agrees with the defendants

that the SAC fails to cure this fatal defect. The SAC's allegations simply repeat that the defendants (collectively) "knew" or "should have known" that the representations and omissions that were made were untrue. *See, e.g.*, SAC ¶¶ 3, 16, 28, 32-35, 42, 50-51, 53, 57, 59-70, 74-75, 81. But the SAC lacks any facts in support of this conclusory assertion.

At certain points, the plaintiffs appear to attempt to allege the circumstances "that might separate fraud from the benefit of hindsight" by pointing to allegations that the defendants touted their financial expertise. *See e.,g.*, SAC ¶ 17 ("Wilkowski extolled the financial acumen of his principals, Daubenspeck and Badger [and] told Greer and Floyd that Advanced Equities had superior knowledge regarding potentially lucrative investments."); SAC ¶77 ("Wilkowski told Greer and Floyd that Advanced Equities had superior knowledge about this technology and that Advanced Equities had confirmed the novelty and commercial potential of the technology."). As an initial matter, the court notes that even the most financially savvy individuals make miscalculations and missteps that are not attributable to fraud. Moreover, these allegations lack any of the specificity required under Rule 9(b)–when and where did Wilkowksi extol the virtues of the principals and say that AEI had superior knowledge about the technology and had confirmed the novelty and commercial potential of the technology? How did he communicate these things and what exactly did he say? These questions are left unanswered and fail to particularize the alleged fraud.

The plaintiffs also appear to attempt to allege circumstances separating fraud from the benefit of hindsight by peppering the SAC with words like "scheme" and "agreement" and "co-conspirators." The defendants argue that because the SAC contains no allegations supporting a conspiracy, the court should disregard these allegations. *Twombly*, 550 U.S. at 555 (in Sherman

Act claim, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"). The court agrees that the SAC fails to include any facts suggesting the existence of an agreement or a scheme or a conspiracy and thus, the court will not assume the truth of these allegations. More importantly, however, an agreement is not an element of the claims at issue and thus does not progress the plaintiffs' position.

Ultimately, while "supplementation [in a brief] cannot save the charge if the charge is one of fraud," *Kennedy*, 348 F.3d at 593, the plaintiffs do not even attempt to add any specifics in their response to the motion to dismiss, and continue to make conclusory statements that the defendants "knew" about the fraud based on their "positions of special knowledge," and "by virtue of their inside position and special knowledge." Response at 8, 10, Dkt. #50. Such conclusory allegations are simply insufficient to satisfy Rule 9(b)'s requirement that a plaintiff plead circumstances separating fraud from the benefit of hindsight.

b.      *Group pleading*

In addition, the plaintiffs fail to allege which of the defendants made which misrepresentations or omissions orally or in the Placement Memorandum. For example, the plaintiffs allege that "Daubenspeck and Badger represented" (SAC ¶ 29) and Daubenspeck and Badger "reviewed and approved the use of the Placement Memorandum." With respect to the alleged misrepresentations and omissions in the Placement Memorandum and Supplement, the plaintiffs respond that "in cases of corporate fraud involving fraudulent statements conveyed in prospectuses or placement memoranda, it is reasonable to assume that these are the collective action of the officers or individuals who drafted, approved, or distributed the documents."

Response at 6 (*citing Petri v. Gatlin*, 997 F. Supp. 956 (N.D. Ill 1997) and *Arenson v. Whitehall Convalescent & Nursing Home, Inc*., 880 F. Supp. 1202 (N.D. Ill. 1995)).  To the contrary, the Seventh Circuit has expressly  "rejected the 'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations . . . ."  *Pugh v. Tribune Co.*, 521 F.3d 686, 693-94 (7th Cir. 2008).

With respect to any oral representations purportedly made by Daubenspeck and Badger, the plaintiffs do not identify the alleged fraudulent statements and actions by individuals and merely change the term "defendants" as used in the previous complaint and replace it with "Daubenspeck, Badger and Advanced Equities" in the SAC.  As the court notes later, such cosmetic changes do not suffice to specify the fraudulent statements and actions by individuals. As noted in its previous order, a complaint alleging fraud, which attributes misrepresentations to all defendants lumped together, is insufficient.  *Sears*, 912 F.2d at 893.

Accordingly, the court grants the defendants' motion to dismiss Count III to the extent that it alleges misrepresentations and omissions made by the defendants themselves.

c.    *Statements by Wilkowski*

Unlike the SAC's failure to attribute fraudulent statements to either Daubenspeck or Badger, the SAC does attribute specific fraudulent statements to Wilkowski.[2]  Upon the court's

---

[2]  The plaintiffs allege that Wilkowski, a non-party, acted as defendants' agent, and therefore his statements are attributable to them.  *See Ackerman v. Northwestern Mut. Life Ins. Co*., 172 F.3d 467, 471 (7th Cir. 1999)("When an agent who is authorized to make a contract on his principal's behalf … uses fraud to induce the contract, the principal is liable even if the agent is acting solely to feather his own nest.").  The defendants do not challenge this argument and so the court does not address the issue.

review of the SAC, it has identified the following allegations regarding the representations made

by Wilkowski:

17.     In the fall of 1999, an Advanced Equities salesman, Wilkowski, contacted Greer and Floyd to solicit them to become customers of Advanced Equities. Wilkowski extolled the financial acumen of his principals Daubenspeck and Badger, told Greer and Floyd that Advanced Equities had superior knowledge regarding potentially lucrative investments and offered, on defendants' behalf, to consult with and advise Greer and Floyd regarding those opportunities.

18.     Greer and Floyd had several communications with Wilkowski and other employees and agents of Advanced Equities regarding a number of investment opportunities, including Pixelon. In those initial communications, Daubenspeck, Badger and Wilkowski offered advice and counsel to Greer and Floyd about the nature and quality of the companies under consideration and the range of investment returns each represented.

19.     Daubenspeck and Badger indicated, and their agent Wilkowski expressly stated, that they operated Advanced Equities, a brokerage and investment advisor they controlled.
        . . .

24.     Among other things, Wilkowski told Greer and Floyd that Pixelon was an up-and-coming internet company that was going to use a special technology developed by the company's founder, Stanley, to become the first provider of TV-quality internet broadcasts. Neither Wilkowski nor any of the defendants disclosed to Greer or Floyd that the "special" Pixelon technology was merely an adaptation of a common Windows Media Player computer program with no special character whatsoever.

25.     Wilkowski told Greer and Floyd that Advanced Equities was "significantly involved with Pixelon" and was planning to have several representatives from Advanced Equities on Pixelon's board of directors. According to Wilkowski, this would allow Daubenspeck and Badger to watch the investment closely and protect plaintiff's position along with their own investment and that of the other Advanced Equities customers. Neither Wilkowski nor any of the defendants told either Greer or Floyd that Pixelon was undercapitalized, illiquid, had taken insider loans, was in dispute with several of its key managers, and was desperate for the infusion of capital that would come from the shares that defendants were trying to peddle.

26. Wilkowski specifically told Greer and Floyd that the principals of Advanced Equities had already invested in Pixelon because they viewed it as a good investment. . . .

27. Daubenspeck, Badger and Wilkowski said that Advanced equities had been working with Pixelon for several months prior to their discussions with Greer and Floyd and had access to all of Pixelon's senior level managers, books, records, contracts, and financial information. Wilkowski told Greer and Floyd that the Advanced Equities research staff was very familiar with Pixelon and its management.

29. . . . Wilkowski . . . then used the representations in the Placement Memorandum to convince Greer and Floyd to invest in Pixelon. . . .

. . .

33. . . . Wilkowski told Greer and Floyd that the Pixelon Network was going to be launched officially at an October 1999 live concert broadcast involving famous musical groups such as The Who, The Dixie Chicks and Tony Bennett. . . .

34. . . . Wilkowski told Greer and Floyd that Pixelon's success depended "in significant part on the continued service of a relatively small number of key senior management personnel, particularly [Stanley], the Company's Founder, Chairman of the Board and Chief Technology Officer" . . . .

. . .

39. In November 1999. . . Wilkowski told Greer that he had been asked by Daubenspeck, Badger and Advanced Equities to speak to Greer because Pixelon needed more money.

40. . . . Wilkowski asked Greer to come to a meeting to consider lending Pixelon $1,000,000 in addition to his equity investment.

. . .

44. [I]n November 1999. . . Daubenspeck, Badger and Advanced Equities sent Wilkowski to tell Floyd that Stanley had been engaging in mismanagement and that his contract was going to be terminated. . . Wilkowski told Floyd that Stanley's departure would not be a problem because Stanley was not really necessary to run the company.

51.    Instead, Daubenspeck, Badger, Wilkowski and Wiskowski had assured
       plaintiffs that the protections in their Placement Memorandum were
       conservative and that there were no other material impediments to
       Pixelon's success beyond those described in the boilerplate of that
       Placement Memorandum. . . .

77.    When they were inducing plaintiffs to invest in Pixelon, Daubenspeck,
       Badger and Wilkowski repeatedly told Greer and Floyd that the success of
       Pixelon's business depended on supposedly proprietary and highly
       advanced streaming technology that allowed Pixelon to broadcast live
       television quality images.  Wilkowski told Greer and Floyd that
       Adavanced Equities had superior knowledge about this technology and
       that Advanced Equities had confirmed the novelty and commercial
       potential of the technology.

The defendants do not dispute that Wilkowski was AEI's agent, but argue that the

allegations of Wilkowski's statements either fail to meet Rule 9(b)'s specificity requirements or

were not material misrepresentations.  In particular, the defendants argue that the allegations

about Wilkowski's alleged misrepresentations regarding Stanley's role in developing Pixelon and

its prospect to become the first provider of TV-quality internet broadcasts fail to satisfy Rule

9(b)'s specificity requirement because the SAC does not allege when or where Wilkowski

allegedly made these misrepresentations.  Reply at 6 (*citing* SAC ¶¶ 24-29, 33-34, 44-45, 51, 77).

This court disagrees.  The plaintiffs allege that Wilkowski made certain misrepresentations in the

"fall of 1999 or "November 1999", *see* SAC ¶¶ 17, 39, 40, 44, which is specific enough under

Rule 9(b).  *See Hefferman v. Bass*, 467 F.3d 596, 601-02 (7th Cir. 2006) (holding that late

August or early September satisfies 9(b)'s time requirement).  However, not all of the allegations

contain a time or approximate date.  *See, e.g.*, SAC ¶¶ 33, 34, 51, 77.  To the extent they do not,

they are insufficient under Rule 9(b).

Moreover, the SAC fails to allege where Wilkowski made these misrepresentations. The plaintiffs do not allege that Wilkowski made the allegations in person, by phone, or even in what city. Indeed, there is barely any mention of Wilkowski in the plaintiffs' response brief let alone any particularized discussion of how the allegations pertaining to him satisfy Rule 9(b)'s requirements. Instead, the plaintiffs have chosen to simply regurgitate the allegations without specifically noting how the allegations satisfy Rule 9(b), which does nothing to assist the court in its resolution of the issue.

In sum, assuming arguendo that Wilkowski was the defendants' agent, his statements are not pled with sufficient particularity and the motion to dismiss this aspect of the Rule 12(a)(2) claim is granted. Because the court concludes that the allegations regarding Wilkowski were not sufficiently particularized, it need not address the defendants' materiality argument.

The defendants' motion to dismiss Count III is granted.

## B.     Count IV–§ 10(b) of the Securities Exchange Act and Rule 10b-5 (against Advanced Equities, Daubenspeck and Badger)

The plaintiffs also allege that the defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5, by making fraudulent statements and omissions of material fact in connection with the sale of Pixelon stock to the plaintiffs. As the plaintiffs note, Counts III and IV arise out of the same operative facts.

### 1.     PSLRA Requirements

To prevail on a claim of securities fraud under § 10(b) of the Securities and Exchange Act and SEC Rule 10b-5, a plaintiff must establish each of the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a

security; (4) reliance; (5) economic loss; and (6) loss causation. *See Pugh*, 521 F.3d at 693. The Private Securities Litigation Reform Act ("PSLRA"), which amended the Securities Exchange Act, provides that securities fraud complaints must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2).

Under the PSLRA, "the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." 15 U.S.C. § 78u-4(b)(3)(A). The motion to dismiss framework remains the same: accept all factual allegations are true and consider the complaint in its entirety. *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The defendants contend that the SAC fails to satisfy both prongs of this section of the PSLRA. However, because the court concludes that the plaintiffs have failed to allege scienter, the court will not address the argument that the plaintiffs failed to plead which statements were misleading and why.[3]

2.  <u>Scienter</u>

The PSLRA requires the complaint to state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2)). "The 'required state of mind' in a § 10(b) case is scienter, which means 'knowledge of

---

[3]However, as the defendants note, the plaintiffs failed to state with particularity the facts that form the allegations made upon "information and belief" (SAC ¶¶ 10, 16, 26, 35, 44, 61, 81).

the statement's falsity or reckless disregard of a substantial risk that the statement is false.'" *Pugh*, 521 F.3d at 693 (*quoting Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)).  To find scienter, the inference must be more than merely "reasonable" or "permissible," it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, *Inc.*, 551 U.S. at 324.

As an initial matter, the court agrees that, as with the previously dismissed complaint, the instant SAC fails to "create a strong inference of scienter with respect to each individual defendant."  *See* June 19, 2009 Order at 14, Dkt. #40 (*citing Pugh*, 521 F.3d at 693).  Indeed, a review of the redline detailing the changes made between the CAC with the SAC, which is attached to the defendants' opening motion, demonstrates that the plaintiffs merely inserted the defendants names for instances in which they had used the term "the defendants" in the previous CAC.[4]  As previously discussed, this change is simply cosmetic and fails to properly address the substantive requirement that the complaint must create a strong inference of scienter *with respect to each individual defendant*.  *Pugh*, 521 F.3d at 694 ("We have rejected the 'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations").

In support of their position that the SAC sufficiently establishes scienter, the plaintiffs argue that the facts collectively show fraudulent intent because: (1) all of the defendants benefited from the fraud and their personal stake created motive; (2) the nature of misrepresentations and omissions are so extreme that a non-culpable motivation is not believable

---

[4]Numerous paragraphs in the SAC fail to allege which individual defendants made statements and only refer to them collectively.  (SAC ¶¶ 3-4, 19-23, 35-37, 39-40, 48, 50, 52-70, 74-75, 81, 83).

and would have raised red flags for any reasonable investor once revealed; and (3) the timing of the misrepresentations and omissions is suspect. The court notes that the plaintiffs do not cite to any authority when discussing these theories. *See* Response at 12-13, Dkt. #50. Again, the court admonishes the plaintiffs that it is not the court's job to ferret out caselaw that supports (or, for that matter, rejects) a party's arguments. In any event, the court rejects the plaintiffs' arguments as discussed more fully below.

Motive Based on Financial Stake. The plaintiffs argue that the defendants "personal stake in Pixelon gave Defendants the motive to bring in additional investors at any cost, no matter how good the Pixelon investment actually was and no matter what Defendants needed to say and do to make it happen." Response at 12, Dkt. #50. The plaintiffs assert in their response brief that "all three Defendants personally benefited from the fraud against Greer and Floyd, both in terms of receiving a commission for bringing in investors and in terms of having the value of their stock shares increase." Response at 12, Dkt. #50. Specifically, the plaintiffs allege that "Advanced Equities received approximately $2,400,000 from the proceeds of the offering of Pixelon Series A Preferred Stock and warrants to purchase in excess of 1,000,000 shares of Pixelon stock for acting as Pixelon's Placement Agent." SAC ¶31.[5]

The court notes at the outset that the allegations that the court could locate in support of the financial motive argument–the plaintiffs fail to specifically identify them in their response brief–are made on information and belief without the factual particularity required under the PSLRA. *See* SAC ¶35 (the defendants concealed "critical information" from the plaintiffs "upon

---

[5]Indeed, the SAC alleges that Pixelon ultimately sought bankruptcy protection and that the plaintiffs' investment in Pixelon has no value. If that is indeed the case, then the defendants' stock in Pixelon is also worth nothing.

information and belief, to preserve their own interests and in the hope of raising enough money to save Pixelon"). *See also* SAC ¶61 ("Upon information and belief, one of the reasons Daubenspeck, Badger and Advanced Equities wanted plaintiffs to invest and then to lend additional monies to Pixelon was to cover losses occasioned by Stanley's mismanagement and rescue the interests which Daubenspeck, Badger and Advanced Equities had in Pixelon themselves.").

Moreover, simple allegations of financial motive do not necessarily establish scienter. *In re Bally Total Fitness Securities Litigation*, No. 04 C 3530, 04 C 3634, 04 C 3713, 04 C 3783, 04 C 3844, 06 C 3936, 04 C 4697, 04 C 1437, 2006 WL 3714708, at *9 (N.D. Ill. Jul. 12, 2006)("Regarding the motive to earn bonuses and awards, we agree with the view of numerous courts that these allegations are too common among corporations and their officers to be considered evidence of scienter."). *See, e.g., Cozzarelli v. Inspire Pharmaceuticals Inc*., 549 F.3d 618, 627 (4th Cir. 2008)("But a strong inference of fraud does not arise merely from seeking capital to support a risky venture. Indeed, the motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud.").

In addition, as noted by another court in this district, "the complaint may plead facts showing motive and opportunity, but there still must be *specific* facts supporting a *strong* inference that the defendant acted with at least a 'reckless' state of mind." *Stephenson v. Hartford Life and Annuity Ins. Co.*, 02 C 3917, 2003 WL 22232968, at *8 (N.D. Ill. Sept. 26, 2003)(citations omitted)(emphasis in original). The SAC is simply devoid of any such allegations. If the court were to accept the plaintiffs' assertion that AEI's receipt of sizable commissions satisfies the scienter requirement under the PSLRA, then disgruntled investor suits

would multiply exponentially and Congress' intent in passing the stringent pleading requirements of the PSLRA would be significantly undermined. *Cozzarelli*, 549 F.3d at 627 ("If we inferred scienter from every bullish statement by a pharmaceutical company that was trying to raise funds, we would choke off the lifeblood of innovation in medicine by fueling frivolous litigation-exactly what Congress sought to avoid by enacting the PSLRA.").

The court concludes that the inference asserted by the plaintiffs is not at least as compelling as the opposing inference that the defendants "would not have agreed to accept warrants for more than one million shares in Pixelon stock as compensation for raising money for Pixelon if they knew that 'Pixelon was a scam that never had a chance of succeeding'" as the plaintiffs have alleged. *See* Reply at 9 (quoting Opp. at 5).

Nature of the Misrepresentations. The plaintiffs also argue that the court may infer scienter because the very nature of the misrepresentations is "so extreme that a non-culpable motivation is not believable." Response at 12; *see also* Response at 3 ("Even the most rudimentary investigation into Pixelon's technology and the background of its CEO, as any director would have done, would have revealed the fraud.").[6] In particular, the plaintiffs argue that because the defendants' misrepresentations and omissions were highly material and went to the core of Pixelon's technology, management, and financial health, the defendants must have had the requisite intent to deceive or reckless indifference to the truth.

The court notes initially that the plaintiffs' repeated allegations that the defendants "knew" and "knew or should have known" of the falsity of the alleged misrepresentation and

---

[6]The plaintiffs do not allege that any of the defendants were directors of Pixelon. Rather, the SAC states that AEI was "planning" to have its representatives on the Pixelon board of directors. SAC ¶25.

omissions, *see e.g.*, SAC ¶¶ 3, 16, 28, 32-35, 42, 50-51, 53, 57, 59-70, 74-75, and 81, are

conclusory and insufficient to satisfy scienter. *Pugh*, 521 F.3d 686 (the plaintiffs' conclusory

allegations regarding the defendant's knowledge were "wholly conclusory" and insufficient to

draw an inference of scienter).

Moreover, in *DiLeo*, the Seventh Circuit specifically rejected an argument that an

accounting firm must have been aware of fraud simply because it certified the bank's financial

statements which understated the amount of bad loans by $4 billion. *DiLeo*, 901 F.2d at 627

("Four billion dollars is a big number, but even a large column of big numbers need not add up to

fraud."). The plaintiffs fail to allege any specific source of information that would have

disclosed the alleged fraud. *See Pugh*, 521 F.3d at 694 (rejecting plaintiffs' attempt to establish

scienter by arguing that "verifying the accuracy of their newspaper sales would have been 'a

relatively easy task'" as "conclusory" and previously criticized by the Seventh Circuit). The

*Pugh* court noted that the plaintiffs' argument that there must be fraud or reckless indifference

because the defendants could have verified the information:

> has also been expressly criticized. In *Higginbotham*, the plaintiffs similarly sought
> to draw an inference of scienter from the fact that the individual defendants had
> access to the subsidiary's allegedly fraudulent financial information. We dismissed
> this argument, stating that "there is a big difference between knowing about the
> reports from [a subsidiary] and knowing that the reports are false. The complaint
> documents the former but not the latter."

*Id.* (*citing Higginbotham*, 495 F.3d at 758).

Here, the plaintiffs allege that "Daubenspeck, Badger and Wilkowski said that Advanced

Equities had been working with Pixelon for several months prior to their discussions with Greer

and Floyd and had access to all of Pixelon's senior level managers, books, records, contracts, and

financial information.  Wilkowski told Greer and Floyd that the Advanced Equities research staff was very familiar with Pixelon and its management."  SAC ¶ 27.  As in *Pugh* and *Higginbotham*, however, allegations of access in and of themselves fail to sufficiently allege scienter.  *See also In re Bally Total Fitness Securities Litigation*, No. 04 C 3530, 04 C 3634, 04 C 3713, 04 C 3783, 04 C 3844, 06 C 3936, 04 C 4697, 04 C 1437, 2006 WL 3714708, at *9 (rejecting argument that the misrepresentations were at the "core" of the defendants' business and therefore the senior executives must be presumed to know facts regarding their central operations and stating that plaintiffs "cannot rely on a 'must have known' theory").  Accordingly, the court rejects this basis for concluding that the plaintiffs have properly alleged scienter.

Timing of the Misrepresentations.  The plaintiffs also suggest that the timing of the misrepresentations support the inference of scienter because only two weeks after Greer and Floyd invested, the defendants asked them for more money, and five weeks later, the plaintiffs found out that Pixelon needed $21 million more.  The plaintiffs assert that Pixelon's "financial condition and many of the transactions that were never disclosed had to have been known by Defendants long before Greer and Floyd invested." (Opp. at 13.)

As the defendants note, however, although they asked the plaintiffs for more money shortly after their original investment, they also disclosed at that same time that Stanley had been terminated and was involved in mismanagement. (SAC ¶ 44).  The court previously concluded with respect to the first motion to dismiss that the fact that the defendants made this disclosure at the time they solicited the additional investment gave rise to an inference that the "defendants were forthcoming when they found out about problems associated with Pixelon and that no intent to deceive existed."  Order at 15.  Moreover, the Supplement issued by the defendants contained

corrections about information regarding Pixelon, again suggesting that "once Defendants became aware of Stanley's mismanagement, they conducted an investigation and promptly disclosed their findings." Reply at 10; *see Higginbotham*, 495 F.3d at 759-61 (holding that issuance of corrective statement does not give rise to scienter). Additionally, issuing a Supplement and disclosing further facts about "Pixelon's true condition" shows that the defendants were forthcoming. *See Arazie v. Mullane*, 2 F.3d 1456, 1467-68 (7th Cir. 1993)("temporal proximity between positive statements stressing a firm's strengths and announcement of poor economic condition do not create an inference that the earlier statements were fraudulent").

Considering the SAC as a whole, the plaintiffs have failed to establish a strong inference, at least as compelling as any opposing inference, that the defendants acted recklessly or intentionally defrauded the plaintiffs. Although the defendants may have had some financial motive to sell Pixelon stock, the SAC does not sufficiently support this motive with factual allegations that give rise to inference of scienter. Furthermore, the plaintiffs' allegations regarding the timing of the misrepresentations and their purportedly extreme nature fall short of supporting an inference that is cogent and at least as compelling as any of the defendants' non-culpable inferences. In addition, the SAC also fails to create a strong inference of scienter for each individual defendant. Accordingly, the defendants' motion to dismiss Count IV is granted.

### C. Count V–Section 10(b) of the Securities Exchange Act and Rule 10b-5 (against Daubenspeck and Badger)

As previously discussed, the plaintiffs allege that, in order to allow the plaintiffs "the opportunity to recoup their investments, their expenses and their opportunity costs," and to "induce Greer and Floyd not to file suit immediately," Daubenspeck and Badger "proposed to

convey additional securities to Greer and Floyd [pursuant to a Consulting Agreement] as consideration for their forbearance" and "to provide full recompense to Greer and Floyd for their Pixelon investment." SAC at ¶85. In this count, the plaintiffs allege that Daubenspeck and Badger violated Section 10(b) of the Exchange Act and Rule 10b-5 by making misrepresentations and material omissions in association with the securities that were to be transferred to the plaintiffs pursuant to the Consulting Agreement. The plaintiffs allege that they justifiably relied on the purported misrepresentations in deciding to enter into the Consulting Agreement and that had "Daubenspeck and Badger . . . fully and accurately disclosed all material facts, Greer and Floyd would not have entered into the Consulting Agreement or the various Amendments to it." SAC ¶¶ 170-71. As in Count IV, because the plaintiffs allege securities fraud, the SAC must adhere to the PSLRA's heightened pleading requirements.

As with the previous count, the defendants argue that Count V fails to allege facts that would give rise to a cogent and compelling inference of scienter. To begin, the court notes that it previously dismissed this count on the ground that the plaintiffs had failed to allege facts from which one could make a cogent and compelling inference of scienter. As demonstrated in the redline SAC attached to the defendants' motion to dismiss, the plaintiffs failed to make any substantive changes to the allegations supporting Count V. Therefore, their position that the SAC sufficiently pleads scienter begins on weak ground.

Without actually amending the allegations, the plaintiffs simply assert that the court should infer the defendants' scienter from their previous conduct. Because the court finds that the SAC has not established scienter in Counts III and IV, it cannot use this as the starting point for inferring scienter here. Moreover, as the defendants note, the plaintiffs have not cited any

authority for finding that a defendant's scienter with respect to one transaction may transfer automatically to a second, completely separate transaction.

Furthermore, the plaintiffs argue that the defendants' purported failure to comply with the Consulting Agreement shows scienter. According to the plaintiffs, "[g]iven their penchant for lying and saying whatever was necessary to benefit themselves, there is a strong inference to be drawn from Defendants' subsequent actions that they never intended to honor the consulting agreement." (Opp. at 14). Without providing any further factual allegations, the SAC does not separate these allegations from fraud by hindsight. Because the court concludes that the SAC clearly fails to properly allege scienter as to Count V, the court need not address the defendants' argument that the SAC fails to specify the statements alleged to have been fraudulent and the reasons why the statements were misleading as required by the PSLRA.

Because the plaintiffs have failed to plead facts supporting a cogent and compelling inference of scienter with respect to Count V, it is dismissed with prejudice.

### D.    Counts III, IV and V–Statute of Limitations

The defendants further argue that Counts III, IV and V are barred by the applicable statute of limitations. In making this argument, the defendants "incorporate" the arguments made on this issue from the motion to dismiss the previous CAC, "excluding the references made to the tolling agreement that Defendants attached to their supporting memorandum." Memorandum at 13, Dkt. #48. Attempts to "incorporate" arguments from previous pleadings, thereby circumventing the page limitations on briefs, is inappropriate without prior leave of court. For this reason alone, the argument is rejected. In any event, as the plaintiffs note, the court previously rejected the statute of limitations argument on the ground that it was premature in this

case. The court rejects the statute of limitations argument for the same reason here.

      **E.**      **State Law Claims**

Because the court is dismissing all of the federal claims with prejudice, it declines to exercise supplemental jurisdiction over the state law claims.

**IV.**      **Conclusion**

For the reasons stated herein, the defendants' motion to dismiss the SAC [47-1] is granted. Because the plaintiffs have had ample opportunity to properly allege their federal securities claims but have failed to do so, the dismissal is with prejudice.

**ENTER:**

**DATE**: January 15, 2010

_Blanche M. Manning_

**Blanche M. Manning**
**United States District Judge**